### BROWN *v.* THE STATE, 32 Miss. Rep., 433.

#### HOMICIDE.

*Dying declarations are admitted as evidence only in cases of homicide.*

The party offering declarations of this character must first prove that they were made under a sense of impending death, and when the deceased had given up all hope of surviving. Such a condition is presumed to silence all motives of falsehood, and induce the mind by the most powerful consideration to speak the truth.

But even then, the accuracy of the memory, and coolness of the judgment are, in general, to some extent impaired by wounds or disease. So that it is generally impossible to make as full, clear and accurate a statement as if in an undisturbed and healthful condition.

Statements made by deceased after the mortal stroke, but before giving up hopes of recovery, and reduced to writing by others, and afterwards, when deceased was conscious of approaching death, sworn to by him, as his dying declarations, are admissible as evidence. But if from such writing part of what deceased said, be omitted, and it appears that the narrative is incomplete, it should be rejected.

*Confessions of an accused person are not the highest and most satisfactory proof of guilt.*

Distinction should be made between confessions deliberately made, and those made in casual conversation.

Erroneous instructions to the jury in a criminal case are no ground for reversal of the judgment unless excepted to in the court below.

In error, from the circuit court of Tippah county. SCRUGGS, J.

Bird R. Brown, the plaintiff in error, was indicted in the circuit court of Tippah county, for the murder of one John Tatum. At the September term, A. D. 1856, he was tried and convicted of manslaughter in the second degree, and was sentenced to the state penitentiary for five years.

It appeared that the deceased was shot on the evening of the 11th day of May, A. D. 1854, and died on the 23d day of the same month.

It was proven that some short time before the killing, unfriendly feelings existed between the prisoner and the deceased, and that a violent altercation took place between them on the 9th of May, 1854, at the house of the defendant's father, in which the defendant applied to the deceased epithets grossly

abusive and insulting; that the deceased soon afterwards, in referring to this altercation, alluded to the insults, and threatened that he would kill the accused unless they were withdrawn; that these threats were communicated to the accused before the killing. It was also proven that the accused made conditional threats against the deceased. On the evening of the 11th of May accused was at a mill in the neighborhood with a negro boy and unarmed; he left the mill about three o'clock for home. It was also shown that on the same evening the accused, with the negro boy, passed near to a spring at which the deceased's wife and daughter were washing, and that he was armed with a gun. Soon afterward the wife and daughter of deceased went to his house, and deceased soon thereafter took his gun and went into the woods, as his family stated, for the purpose of hunting his oxen and squirrels. Deceased's wife and daughter denied that they had informed him that they had seen Brown pass the spring; but it was proven on behalf of the defendant that deceased stated after he was shot that they did so inform him. It also appeared in proof that the accused and the negro boy with him, were hunting oxen at the same time they were seen passing the spring.

Dr. J. W. Carter, a witness for the state, who was sent for on the evening of the 11th of May, to dress the wounds of deceased, and who attended on him until his death, upon cross-examination by defendant, stated: That deceased, on the evening he was shot, stated to witness that he (deceased) was in the woods hunting his oxen; that he had a rifle-gun with him; that he saw Bird R. Brown, the prisoner, passing by him in the woods, and that deceased called to Brown to stop; that deceased went up to where Brown was and asked him why he was talking about him; that he ought to wait for older people to talk about him first; that in the course of the conversation deceased told Brown he had stolen a gun, or had as well have stolen a gun; that Brown gave him the d——d lie.

Witness further stated, that when he went to the house of deceased, on the morning the dying declarations were taken, H. B. Robinson was there; that Robinson was going forward to take the declarations in presence of, and in the room where deceased

was lying; witness objected to this, because he feared it would affect deceased injuriously. Witness directed Robinson to go into another house near by, and that he did so; that deceased made no statement to Robinson in his, witness's, presence about the facts of the case, and of the meeting of defendant and deceased in the woods, nor as to how the shooting occurred. Witness further stated, that he and Robinson consulted together, as to whether they should ask the deceased whether he did or did not snap or present his gun at Brown, for the purpose of putting his reply in the dying declarations; that on witness's suggestion they concluded it was not necessary, because it was matter for the defendant himself to establish. Witness had heard that defendant had said that deceased snapped or presented his gun at him, and therefore he, witness, asked deceased if such was the fact, to which deceased replied, that he did not snap or present his gun at defendant, "for he knew he had no cap on the tube."

Witness further stated, " that he had heard deceased tell over the circumstances of his and defendant's meeting in the woods, from time to time, after he was wounded, and that he told Robinson to write the declarations down as he, witness, should repeat them to him from memory, and that he, witness, would go from the house where the declarations were being written down, to the room where deceased was lying, and ask deceased questions as to any matters that witness had any doubts about; that in this way the declarations were taken—he, witness, repeating from memory what deceased had told him from time to time, soon after he was wounded up to Saturday before he died, and that on Monday following, Robinson wrote the statements down as witness recited them to him." Witness further stated, that he went two or three times to the room where deceased was lying, to ask him questions about the facts, and to bring back the answer of the deceased; but that he does not know and cannot state what facts he inquired about of deceased, on these occasions; that he is not able to state what facts are written down in the dying declarations, from what deceased told him before deceased was convinced he would die, nor can he tell what facts are stated in said declarations, from what deceased told him

after deceased thought he would die, but that the larger part of the facts embraced in the dying declarations are those which deceased told witness of, before he thought he would die.

Witness further stated, that he repeated the declarations of deceased just as he had repeatedly told him. He further stated, that he and Robinson left out and omitted some things that deceased had said in relation to the way in which deceased and defendant met in the woods, and the quarrel between them; because they thought them unnecessary. The witness being asked if he had told Robinson, while he was writing down the declarations, that deceased had told him, witness, " that he (deceased) called to defendant as he was passing him in the woods, and went up to him," answered that he did so repeat it to Robinson; and being further asked if it were so written down in the dying declarations, answered that he could not state from memory what was in the dying declarations, and that they would speak for themselves." Witness further stated, that when the dying declarations, drawn up as before stated, were read over to deceased, he was weak and feeble, and spoke only in a whisper, his throat being much disordered.

H. B. Robinson, for the state, testified that he was sent for by deceased to take his " depositions" the night before the declarations were taken, but did not go until next morning, which was on the day before he died. Witness further stated that deceased told him in part what occurred between deceased and defendant when they met in the woods, and when the shooting occurred; that this was done on the morning the declarations were written, and in presence of Mr. Adams. The witness also identified the paper containing the dying declarations of deceased, and hereinafter copied. Witness concurred with Dr. Carter as to the mode in which the declarations were written down. He also stated, that, after finishing writing them out, he carried them to deceased, and read over to him, and called his attention to them; that deceased was then in his senses, and said that the declarations were right and as correct as he himself could state them under oath. Witness then administered an oath to deceased to the truth of the declarations.

On cross-examination, the witness was asked if the deceased

told him any of the facts connected with the deceased and the defendant's meeting in the woods, and the facts that occurred at the time of the shooting; to which witness answered, " that the deceased did—that the deceased told him what was written in the dying declarations, as far as that he, deceased, ' had not put a cap on the tube.' "  Witness was further asked if he had not told Melton Young, at his office in Ripley, some eight or ten days previous to the commencement of the September, A. D. 1856, term of the circuit court, " that all that deceased had told him, as to the facts of the meeting of defendant and deceased in the woods, when the shooting occurred," was " *that the deceased and defendant met in the woods alone,* and that just as deceased made the statement to witness, Dr. J. W. Carter stepped in and objected to any further conversation."  Witness, in answer thereto, denied having made the statement.

Melton Young was afterwards introduced on behalf of defendant, and testified that Robinson had made the statement to him as contained in the interrogatory propounded as above.

Polly Adams, for the state, among other things, stated that she was present when the dying declarations drawn up by Robinson were presented and read over to deceased; " that Dr. Carter came into the room and told deceased to arouse up and collect his senses; that the doctor slapped him about a little to awake him, and then H. B. Robinson read over to him the dying declarations."

The state then offered in evidence the dying declarations drawn up by Robinson; the prisoner objected, but his objection was overruled, and the prisoner then excepted to the opinion of the court.  The instrument read as follows :

"State of Mississippi, }
     Tippah county.      }

" Personally appeared John Tatum, senior, before me, Harris B. Robinson, an acting justice of the peace in and for said county, and made oath in due form of law; deposeth and sayeth that on the eleventh day of May, in the year 1854, on his own land, a short distance from his own dwelling, he did then and there fall in company with one Bird R. Brown, the said Tatum, having just discharged his rifle at a squirrell, and had loaded

his gun, but had not put on the cap on the tube; he the said Tatum resting the butt of his gun on a log. Whilst in this position, there was a dispute arose between them, standing face to face, some 8 or 10 feet apart. After some conversation, Brown gave Tatum the damed ly repeatedly; the said Brown then said he intended shooting of him; after pausing a half a minute or more, he accordingly did shuit, discharged one barrell of his shot-gun, and the said Tatum received some several shot in his neck and shoulder. Question ast by Robinson: Tell me what position you was in when you was shot? Answer: We was face to face, until I discovered him, the said Brown, in the act of shooting; I then rather srunk back, turning myself to the rite when I received the shot. Question: What did Brown do? Answer: He went of amediately up the hill, calling back unto a negro boy who had bin in company with him, to come on, for he had kill the damed old raskell, leaving me, so I saw him no more.

his<br>
" JOHN + TATUM, [L. S.]"<br>
mark.

" Sworn and subscribed before me on the 22 day of May, 1854. Given under my hand and seal, day and date above written.

" HARRIS B. ROBINSON, [L. S.]<br>
" *Justice of the Peace.*"

Jesse Allen, for the state, testified that soon after the shooting the defendant came to his house and staid all night, and they had a conversation in relation to the difficulty. Witness did not recollect all that the defendant said. He stated that the defendant told him that the first difficulty was about dogging hogs; that deceased came to his father's house, where defendant lived, and abused his father and mother and himself very much. That the day the shooting took place, he was out in the woods hunting his oxen, and as he was going up a little valley or branch bottom, he heard a rifle-gun fired, which he knew was Tatum's gun; defendant then turned up on the side of the hill, and was passing by where deceased was, who called to defendant

to stop ; that he did so, and that deceased then went to defendant and put his gun across his arm as if he was putting a cap on the tube as he went along towards him.   He then came up to defendant and commenced abusing him, and called him a thief, and then he gave the deceased the d——d lie ; that deceased said he would not take that from any man, and presented his gun at defendant, and snapped it twice at him.   Defendant saw there was no cap on the tube of deceased's gun, and that he knocked the gun off one side and fired.   Witness asked defendant why he fired when he saw there was no cap on the gun, and defendant replied that he was " agitated."

Witness was asked, on cross-examination, if he was certain that defendant had used the words he had repeated about " *seeing* there was no cap on the tube."   He replied he could not be positive, but that he believed his first statement was correct, though it is possible he might be mistaken.   Witness was then asked if defendant did not tell him (instead of what witness had sworn) that defendant " had, upon reflection, thought that deceased had no cap on his tube ;" to which witness replied that it might be so, but that he did not think so.   His first statement was according to his recollection.

The testimony was conflicting as to whether the declarations of the deceased read in evidence were made under a belief of impending death.   Several witnesses, on behalf of the prisoner, testified to declarations made by the deceased after he was shot, contradictory of the statement contained in the paper drawn up by Robinson.   Several other witnesses were also examined, both by the state and the defendant, in relation to matters material to the issue, but the foregoing is all that is deemed necessary to set out in order to a correct understanding of the opinion of the court.

Numerous instructions were given, both at the instance of the prosecution and the defense, but only the 14th given for the state is necessary to set out, and that is copied in the opinion of the court.   After the court had instructed the jury at the instance of both parties, he, of his own volition and without being requested by either party, instructed the jury generally on the law in relation to homicide.   These charges are con-

tained in the bill of exceptions taken to the judgment of the court overruling the prisoner's motion for a new trial, but there is no statement or recital in the bill of exceptions that any exception was taken to the action of the court in that respect, except that it was assigned in the motion for a new trial, as cause for the granting of the same, that the court had erred in giving certain instructions asked for by the state, and in charging the jury generally of his own volition, and without being requested so to do, as before stated.

The defendant's motion for a new trial being refused, he excepted, and sued out this writ of error.

*John W. Thompson* and *Hugh R. Miller*, for plaintiff in error.

*D. C. Glenn*, attorney general.

SMITH, C. J. :

The plaintiff in error was tried upon an indictment for murder, in the circuit court of Tippah county, and convicted of manslaughter in the second degree.    Several errors are assigned as causes of reversal.    They respect the admission in evidence of the dying declarations of the deceased ; the charges granted at the instance of the district attorney, and certain instructions, which were requested by the prisoner, and refused by the court ; the general charge delivered, of his own motion, by the judge, and the judgment overruling the motion for a new trial.

We shall notice, first, the alleged error in the admission of the dying declarations of the deceased.

Declarations of this character are a species of hearsay evidence ; and are admitted under an exception to the general rule which rejects all evidence of that nature.    They are permitted, only, in cases of homicide ; and from considerations of necessity. The general principle on which this species of evidence is received is, that they are declarations made when the party is at the point of death, having given up all hope of surviving.    A sense of impending death is presumed to silence every motive to falsehood ; and to induce the mind, by the most powerful considerations, to speak the truth.    The obligation thus created is regarded by the law as equal to that imposed by a positive oath

in a court of justice.[1] Rex v. Woodcock, 2 Leach Cr. Cases, 567. That such declarations were made under a sense of impending death, is essential to their admissibility, and that they were so made is a preliminary fact to be proved by the party offering them. 1 Greenl. Ev., § 158.

The accuracy of the memory and the coolness of the judgment of a person *in extremis*, are, in general, to some extent impaired by his wounds or the disease under which he labors. And although by his situation he is placed under a strong obligation to speak the truth, and freed from every motive to falsehood, it is impossible, generally, that he should be as well qualified to make a full, clear, and accurate statement of the facts of the transaction, to which he speaks, as he would be if his body and mind were both in an undisturbed and healthful condition. A person in that situation is liable to be impressed and easily influenced by the feelings and suggestions of those around him. Consequently, he is the more apt to confound the impressions thus created in his mind, and inferences drawn from the circumstances of the transaction, with the facts themselves. And, it is to be considered that the acts of violence, to which the deceased may have spoken, were in general likely to have occurred under circumstances of confusion and surprise, calculated to prevent their being accurately remembered, and leading to the omission of facts important to the truth and completeness of the narrative. Moreover, the party to be injuriously affected by such declarations is deprived of the privilege of cross-examination. It is, therefore, the dictate of reason and common sense, that declarations of this character in all cases and under any circumstances, should be admitted with caution, and weighed by the jury with the greatest deliberation. 1 Greenl. Ev., § 162.

According to some of the decided cases, it is sufficient if the substance of the declarations be proved, and consequently that it is not essential to the admission of such evidence that the precise words of the deceased should be proved. 11 Ohio R., 424. But for very obvious reasons, declarations *in articulo mortis*, which are partial and incomplete statements of the facts of the

---

1 DYING DECLARATIONS.—The general principle on which this species of evidence is admitted is, that they are declarations made in extremity.

transaction should not be allowed to go to the jury. Am. Cr. Law, 249. For similar and additional reasons, dying declarations, however formally drawn up, and complete upon the face of them, should. be rejected, if, from the preliminary examinations, it satisfactorily appeared that they were made under the suggestion of improper influences; or, through the agency of others, are so drawn up as to present a partial, incomplete or false statement of the facts of the transaction.

We shall not pause to inquire whether the deceased, at the time the paper purporting to be his dying declarations was read, subscribed and sworn to, acted under a sense of impending death, but will proceed directly to the objection mainly relied on; which is, that the declarations were not written under the immediate dictation of the declarant nor in his presence, and that important and material facts connected with the alleged homicide were intentionally omitted by the parties who drew them up.

Dr. J. W. Carter and H. B. Robinson were the agents in this transaction, and were examined as witnesses for the prosecution. We shall extract such portions of their testimony, as have immediate reference to the question before us.

Dr. J. W. Carter testified that he was a practicing physician, and was called in to see the deceased on the evening of the 11th of May, 1854, and " found deceased wounded with shot, which seemed to pass from the left side to the opposite side, cutting the skin of the throat over the windpipe, and lodging in the right shoulder." The deceased died from the effects of the wounds, on the 23rd of May, 1854. On Sunday night, (the 22d of May) witness conversed with the deceased about his prospects of recovery. Witness told him that his family desired " to know how he felt on the subject of death, and about his business;" deceased replied, that " there were some matters of business which he had thought he would have arranged before that time, but that he disliked to disturb his family." Witness then thought deceased's case a very doubtful one; but deceased then expressed no opinion as to whether he would live or not. Witness did not remember whether this conversation was before or after deceased had the spasm on Sunday night (22d), but it is certain that it was on that night; deceased said nothing to witness on Sunday

night after he had the spasm as to whether he thought he would die or not. "That, when the dying declarations were read over to him and signed, he (deceased) was weak and feeble, and spoke only in a whisper, his throat being much disordered."

On cross-examination, this witness further testified that the evening after deceased was shot, he stated to witness that he was in the woods hunting oxen ; that he had with him a rifle gun ; that he saw defendant passing by him in the woods, and that he called to defendant to stop ; " that deceased went up to where defendant was ;" " that in the course of conversation deceased told defendant he had stolen a gun, or had as well have stolen a gun ;" "that defendant gave deceased the d—d lie ;" that when witness went to the house of the deceased on the morning the dying declarations were taken, H. B. Robinson was there. " Robinson was going forward to take the declarations in the presence of, and in the room where deceased was lying ;" witness objected to this, and " directed Robinson to go into another house near by to take the dying declarations." Robinson did so. " Deceased made no statement to Robinson in witness' presence about the facts of the case, of the meeting of the deceased and defendant in the woods, nor of how the shooting occurred." Deceased made no statement in the presence of witness to Robinson " as to whether deceased thought he would live or not." Witness and Robinson " consulted as to whether they should ask deceased whether he did or did not snap or present his gun at defendant, for the purpose of putting his reply in the dying declarations ; that on witness' suggestion they concluded it was not necessary, because it was matter for the defendant himself to establish." Witness had heard the deceased tell over the circumstances of his and defendant meeting in the woods, " from time to time after he was wounded," and told Robinson to write the declarations down, as witness recited them to him. " Witness then went two or three times to deceased to ask him questions as to any matters that witness had any doubt about ; in this way the declarations were taken." Witness " would repeat from memory what deceased had told him from time to time, soon after he was wounded, up to Saturday before he died, and then Robinson wrote the statements

down as witness recited them to him." Witness went two or three times to deceased to ask him questions about the facts, and to bring back the answers of the deceased, " but did not know and could not state what facts he inquired about on these occasions." Witness could not state " what facts are written down in the declarations" from what deceased told him before he was convinced he would die, nor could he " tell" what facts are stated in the declarations from what deceased said after he thought he would die ; but that the larger part of the facts embraced in the dying declarations were communicated to witness before deceased " thought he would die." Witness " gave in or repeated the declarations of deceased just as deceased had repeatedly told them to witness," and " that Robinson wrote them down just as witness recited the same to him." That witness and Robinson " left out and omitted some things" which deceased said, " that they thought were unnecessary, about the way they (deceased and defendant) met in the woods and the quarrel between them." To the question whether witness " told Robinson while he was writing down the delarations, that deceased told him that he (deceased) called to defendant as he was passing him in the woods, and went up to him," he answered " that he did so repeat it to Robinson." And upon being further asked " whether it was so written down in the dying declarations," replied " that he could not state from memory what was in the declarations, and that they would speak for themselves."

Robinson testified that he was sent for by deceased to take his " depositions" the night before they were taken, but did not go until the next morning. Upon inquiring for what purpose he had been sent for, deceased replied, to take his depositions. " That deceased told him, in part, what occurred between deceased and defendant when they met in the woods, and when the shooting occurred." That before the declarations were reduced to writing, deceased said to witness " he was very low ; " " that the doctors had got scared and had given him out ; and that he was going to die." The paper purporting to be the dying declarations of the deceased lay there. Dr. Carter would bring to him the facts as stated by deceased, and witness would write

them down. After finishing the writing, they took it to deceased and called his attention to it, and read it over to him; deceased was entirely himself, and said it was right; that it was correct as he could state it under oath. The deceased was sworn to the statement, and his mark, at his request, was affixed to it.

On cross-examination, witness being asked, "if the deceased told him any of the facts connected with deceased and defendant's meeting in the woods, and of the facts that occurred at the time of the shooting," answered, "that deceased did; that deceased told him what was written in the dying declarations, as far as that he, deceased, had not put a cap on the tube."

Mrs. Adams, a witness for the prosecution, testified that she heard the deceased tell Robinson that he was going to die, and wanted him to take his dying declarations; that they were read to the deceased; "that Dr. J. W. Carter came into the room and told deceased to arouse up and collect his senses, and that the doctor slapped deceased about a little, to awake him."

The paper, identified by Robinson as the dying declarations of the deceased, was read in the following words, to wit: "Personally appeared, John Tatum, before me, Harris B. Robinson, etc., and, having made oath in due form of law, deposeth and saith, that on the 11th day of May, in the year 1854, on his own land, a short distance from his own dwelling, he did then and there fall in company with one Bird R. Brown; the said Tatum having just discharged his rifle-gun at a squirrel, and had loaded his gun, but had not put the cap on the tube; he, the said Tatum, resting the butt of his gun on a log; whilst in this position, there was a dispute arose between them, standing face to face, some eight or nine feet apart; after some conversation, Brown gave to Tatum the damned lie repeatedly; the said Brown then said, he intended shooting of him; after pausing a half minute or more, he accordingly did shoot—discharged one barrel of his shot-gun—and the said Tatum received some several shot in his neck and shoulder. Question asked by Robinson: Tell me what position you were in when you were shot? Answer: We were face to face, until I discovered him, the said Brown, in the act of shooting; I then rather shrunk back, turn-

ing myself to the right, when I received the shot.   Question:
What did Brown then do?   Answer: He went off immediately
up the hill, calling back unto a negro boy, who had been in
company with him, to come on, for he had killed the damned old
rascal, leaving me; so I saw him no more."

The evidence showed, that feelings of animosity existed be-
tween these parties, and that mutual threats were made.   That
the threats made by the accused were communicated to the
deceased prior to the rencontre in the woods; and that the negro
boy was the sole witness of the transaction.   This latter fact
was well known to Dr. Carter, whose report, made from memory,
of deceased's declarations, was reduced to writing by Robinson.
These persons must have known, that if the wounded man died,
his declarations which they drew up, would determine the fate
of the accused.   The deceased's dying declarations, in the ab-
sence of any contradictory evidence, would establish conclu-
sively the commission of the homicide by the defendant; and
these parties well knew that, if, in fact, any circumstance of
justification, excuse, or palliation existed in connection with
the meeting in the woods, there was no means by which they
could be proved, except by these very declarations.   Under these
circumstances, the safety of the accused required it; and hu-
manity and justice demanded, that they should contain a fair,
full, and complete account of the facts and circumstances of the
transaction.

When we compare the declarations composed, and prepared
upon consultation, for the deceased, with the circumstances of
the meeting in the woods, as detailed by the declarant himself
to Carter, it is impossible not to perceive that the statements
contained in the paper read to the jury, are partial, incomplete,
and flagrantly unjust to the accused.

It was in proof that the accused and the deceased were un-
friendly towards each other; they had quarreled, and mutual
threats had been made.   The deceased had said that he would
take the life of the accused, unless the accused retracted an in-
sult which he had given to him.   Under these circumstances, it
was of vital importance to the accused, and essential to truth
and the justice of the case, that it should be shown, if such

were indeed the fact, that the interview in the woods was not sought by him; that he did not begin the colloquy, and was not the first to use abusive, degrading and insulting language. On the contrary, the dying declarations, drawn up in the manner stated in the testimony, showed that the meeting took place on the land of the deceased and near his dwelling; and that the accused, without the slightest provocation, first outraged the deceased by gross insults, and then deliberately discharged the contents of his gun into his body.

The declarations were not dictated by the deceased, nor reduced to writing in his presence. They were drawn up from Carter's recollection of the statements made to him, at different times, by the deceased. And when we turn to Carter's testimony, it is manifest that they were not the same account or history of the transaction which was given to him by the deceased, and repeated on several occasions. For according to the testimony of this witness, the deceased stated to him that the accused was passing by in the woods, and, perhaps, unconscious of the presence of any one, when deceased called to him to stop—went up to him—commenced the quarrel—and charged the defendant with the commission of a larceny. Further, that witness and Robinson omitted and left out of the written statement, some things about the way the parties met in the woods, and the quarrel that ensued, which had been communicated to Carter by the deceased. This seems to have been done designedly, and under the impression that any facts connected with the interview, which would excuse or palliate the homicide, were matters of defense, which it devolved upon the accused to establish.

It seems clear, therefore, that the statement read to the jury, as the dying declarations of the deceased, ought not to be regarded as such, and should have been excluded, unless they were made so by the subsequent act of the deceased in swearing to and subscribing them.

By swearing to the declarations which were drawn up and read to the deceased, he adopted them as his own. And no sufficient reason can be urged, why such an act of recognition and adoption should not render declarations of this character admissible as evidence, where the declarant acted under a sense

of impending death, and was in a condition fully to understand the contents of a document thus prepared; and did, in fact, fully comprehend the statements contained in it.

But in this case there are strong reasons for believing that the deceased did not fully understand the declarations as read to him, or that his faculties were so much impaired by the wounds under which he suffered, that he was incapable of remembering with distinctness or stating with accuracy the facts and circumstances of the rencontre which resulted in his death. It is true that Robinson testified that he was entirely himself when the declarations were read. But Mrs. Adams states, that when Dr. Carter came into the room, he told the deceased " to arouse himself and collect his senses," and " slapping him about a little, to wake him." And when we consider that the statement, sworn to by him as his dying declarations, was materially different from the account he gave of the affair to Carter, the conclusion is not to be resisted that he either did not understand what was read to him, or did not remember what had transpired at the meeting between himself and the accused in the woods.

In addition, there are circumstances even calculated to excite suspicions as to the propriety of the motives under which Carter and Robinson acted; and to authorize the presumption that an improper influence was exercised over the deceased, whose mind and memory, it is reasonable to suppose, were clouded or impaired by the mortal wounds under which he was laboring. These persons acted upon consultation; and for reasons, which it is difficult to reconcile with their innocency, excluded from the statement, which they drew up, every circumstance connected with the meeting in the woods, which was at all exculpatory of the accused. They must have known that such facts did exist, and that unless they were brought to light through the dying declarations of the deceased, there was no possible way of proving them on the trial of the accused.

We think, therefore, that under all the circumstances disclosed, the court erred in admitting this evidence.

The charges granted at the instance of the prosecuting attorney and the prisoner are very numerous. Some of the instructions given in behalf of the prosecution are relied upon as a

ground of reversal. The refusal of the court to give certain charges in behalf of the accused is also assigned for error.

We have no hesitation in saying that the 14th instruction, granted in behalf of the prosecution, was erroneous. That instruction is in the following words: "Confessions made by a person charged with an offense, when made voluntarily, and not obtained by force, fraud or threats, are regarded by the law as the highest and most satisfactory character of proof. If, therefore, the jury believe from the confessions of defendant, as given in evidence, that the defendant shot Tatum, the deceased, at a time when he knew that Tatum had no power to do him any injury, then such shooting was unlawful, and defendant is guilty of either murder or manslaughter, according to his intention at the time of shooting."

The confessions of prisoners are received in evidence upon the presumption that a person will not make a false statement which will militate against himself. And while the elementary writers, and the courts, have not entirely agreed upon the weight to be given to this species of evidence, it is admitted by all that it should be received with great caution. "For," says Blackstone, who maintained that confessions in cases of felony were the weakest and most suspicious of all testimony, "they are very liable to be obtained by artifice, false hopes, promises of favor, or menaces; seldom remembered accurately or reported with precision, and incapable in their nature of being disproved by other negative evidence." 4 Com., 357. Subject, however, to the proper caution in receiving and weighing them, "it is generally agreed that deliberate confessions of guilt are amongst the most effectual proofs in the law." 1 Green. Ev., § 215. But that they are to be "regarded as the highest and most satisfactory character of proof" has never been the doctrine of this court. And it was held in Stringfellow's case, that, without proof, *aliunde*, of the *corpus delicti*, the extrajudicial confessions of the prisoner were not sufficient to warrant his conviction. 26 Miss. Rep., 137.

The charge, therefore, gave too great weight to this species of evidence. It is objectionable also, because it does not draw any distinction between confessions deliberately made, whether judicial or otherwise, and statements or confessions made in

casual conversations. It was further objectionable for the reason that it referred directly to the evidence of a particular witness, who testified to a statement made by a prisoner in a conversation with himself, and who admitted that he might be mistaken as to the precise words of the accused; giving to an admission the import of which was not remembered with absolute certainty, all the weight which is due to confessions formally and deliberately made by a party charged with a crime. It wears very much the appearance and was calculated to have the effect of a charge against the prisoner on the weight of evidence.

But for this error, or any other which may have occurred in the instructions to the jury, we would not be authorized to reverse the judgment, as no special exceptions were taken in the court below in conformity with the directions of the statute of the 11th of March, 1856, Session Acts, 86.

For the first error noticed, we reverse the judgment, remand the cause, and award a *venire de novo.*