# THE STATE v. JOHNSON, *Appellant.*

### Division Two, December 7, 1893.

1. **Practice, Criminal:** INDORSEMENT OF MATERIAL WITNESSES ON INDICTMENT. The objection that a witness is incompetent to testify because his name was not indorsed on the indictment, cannot be raised for the first time in the motion for a new trial.

2. **Criminal Law:** EVIDENCE: DYING DECLARATIONS. A dying declaration, to be admissible in evidence, must not only be made by the declarant under a sense of the actual nearness of death, but there must be an absolute conviction of it in his mind. It is not enough that he should have thought he would ultimately never recover, but the declaration must have been made under an impression of almost immediate dissolution.

3. ——: ——: ——. Such declarations are not admissible when fragmentary or incomplete, or when the witnesses cannot give the words or the substance of all that was said by the deceased, or where the latter, as part of the dying declaration, did not say who was the perpetrator of the crime.

4. **Practice, Criminal:** DYING DECLARATIONS. The propriety of the admission of dying declarations is a preliminary question for the determination of the court before they are permitted to go to the jury. But if they are improperly admitted, it is an error which can be corrected on appeal.

5. ——: ——. Where dying declarations are improperly admitted in evidence, a verdict of conviction should be set aside, although there is other evidence tending to establish guilt, as in such case it cannot be determined what influence the dying declarations had either on the verdict or the amount of the punishment.

6. ——: ——. The dying declarations in this case *held* not to come within the rule rendering them admissible in evidence.

7. **Common Knowledge:** JUDICIAL NOTICE. Courts will take judicial notice of matters of common knowledge, *e. g.*, that tobacco, when taken into the stomach will produce nauseating effects.

*Appeal from Bates Circuit Court.*—HON. JAS. H. LAY, Judge.

REVERSED AND REMANDED.

Under an indictment charging manslaughter in the second degree for killing Samuel Keene. Tried, he was convicted of manslaughter in the fourth degree, and his punishment assessed at imprisonment in the penitentiary for the term of two years.

The deceased, defendant and some others were riding on horseback along the public road leading from Butler toward their respective homes on Friday, the eleventh of March, 1892. Defendant had a bottle of whiskey, of which he partook freely and the others sparingly, at his request. While on the way homeward, and after dusk, an altercation sprang up between deceased and defendant, in which the defendant, it seems, was the aggressor, using opprobrious epithets toward deceased, the result of which was that both parties got down off their horses and engaged in a scuffle in the road. Whether any blows passed no witness could state, but the outcome of it was that deceased was found on his back and defendant on his hands and knees on top of deceased, when defendant said to deceased "I could pound you up here, but I've got more respect for your family than that," to which deceased made no reply. Then defendant said to deceased: "I'll let you up if you say you've got enough;" but deceased said, "I won't say I've got enough." Then deceased said to defendant, "Bob, let me up; I've swallowed a chaw of tobacco." Thereupon defendant did so and deceased walked a quarter of a mile in the direction of his home, his horse having gotten away and gone in that direction, when defendant said to deceased: "Get up behind me and ride; you shan't walk home;" when Marquis Young told deceased no, he had better ride behind him, which he did, and rode home with him. Then defendant told deceased he had whipped him and deceased replied, "Bob, it ain't all settled yet," when defendant offered to settle it there, if

deceased wanted to.  Johnson then rode off towards his home.

Meanwhile Newton Young, who had gone in pursuit of deceased's horse, returned with it and met deceased riding behind Marquis Young.  The moon was then shining brightly, and Newton Young said to deceased, "I see some blood there on your ear," and he just laughed and he says, "I reckon that's where he scratched me." Thereupon Newton Young asked deceased if he had got hurt, and he said he had not.  Marquis Young also observed a little blood on the left ear of the deceased, and deceased also told Marquis Young he was not hurt. Before Johnson left the other parties, he remarked that he had hurt his fist; that he had thrown his thumb out of joint; that "his (deceased's) head was so damned hard, he hurt his fist."

On the same evening about eight o'clock, defendant went into a drug store at Spruce, and was looking for deceased, said he had whipped the ———— ———— in the road, and that he had agreed to meet him and have it over again at Spruce, and he also said something about having bitten deceased's ear off.  To another witness on the same evening, defendant, who was evidently much the worse for liquor, said that he had a fight with deceased and that he had "knocked him (deceased) down and choked and beat hell out of him."

Keene, the deceased, died on the next night, Saturday.  An autopsy being held upon his body, a bruised place or contusion was discovered near his left ear and on the opposite side of the head; on opening the skull, an extravasation of blood was found on the right side which, in the opinion of the physicians was caused by a blow near the left ear, or a fall on that spot and that this blow or fall was the cause of the death of deceased.

When Marquis Young rode home with deceased, he got off the horse and went into the house, and Young then put up the horse and went into the house; deceased was lying on the bed, was vomiting; he had been vomiting when Young came in. At that time he heard deceased say nothing about any injury he had received, and soon afterwards deceased became unconscious. Young then went after Dr. Colson but did not reach the doctor's until a little after twelve o'clock, and when the doctor reached deceased, he found him in a comatose condition, but he returned somewhat to consciousness so as to know persons about him; but made no statement respecting his injuries.

Mrs. Keene, wife of deceased, who had not testified at the preliminary examination or at the coroner's inquest, testified at the trial of defendant as to certain dying declarations alleged to have been made by deceased soon after his arrival home. That testimony, given over the objection of defendant, was the following:

"*Q.* Now, you can just turn to the jury and tell the condition he was in when he came home. *A.* When he came home his head was bloody and I asked him what was the trouble and he said Robert Johnson had hit him and knocked him down.

*Q.* You saw his head was bloody? *A.* Yes, sir; I washed the blood off.

*Q.* What part of his head appeared to be bloody? *A.* On the left side of his head and his ear.

*Q.* Did you notice any injury to his ear? *A.* Yes, sir; it was still bleeding.

*Q.* His ear was still bleeding? *A.* Yes, sir.

*Q.* What time in the evening was it when he come home? *A.* About dusk.

*Q.* How long did he remain in that condition, that is, conscious? *A.* Well, I don't know exactly how long, but from an hour and a half or two hours.

*Q.* That he remained conscious? *A.* Yes, sir.

*Q.* You can state whether he was conscious of the fact that he was going to die before he died? *A.* Yes, sir; he was.

*Q.* What did he do to indicate that he knew that he was going to die? *A.* In the first place he bid us good-bye—called the children first.

*Q.* What time was that? *A.* It was on the night of the eleventh,—of Friday.

*Q.* How long after he come home? *A.* It wasn't a great while, because he wasn't conscious a great while.

*Q.* This was before he became unconscious? *A.* Yes, sir; he knew everything.

*Q.* Just tell the jury what he did before he told you what he did? *A.* He went to bed as soon as he got home; then he called to the family.

*Q.* What did he say that indicated to you that he knew he was going to die? *A.* He just said—

*Q.* What did he call you for and what did he call the family for? What did he say to the family? *A.* He told us that he was bound to die, was one thing. I can't tell it word for word, somehow.

*Q.* But he told you that he was bound to die? *A.* Yes, sir; that he was done work for his children and that they would soon be done for.

*Q.* Did he make any statement as to how he was injured and what was the cause of his death?

*Mr. Francisco:* I make the objection that there has not been the proper foundation for any statement that may have been made, and for that reason is incompetent. Overruled by the court; to which ruling the defendant, by his counsel, then and there duly excepted at the time.

*Mr. Francisco:* Who was present, Mrs. Keene, at this time? *A.* When Mr. Keene come home?

*Q.* Yes.　*A.* His family was at home, and my brother.

*Q.* What was his name?　*A.* Marquis.　He come home with him but he wasn't in the house but a little while.

*Q.* Was Mr. Keene vomiting when he come home? *A.* He vomited a little while after he come home.

*Q.* Was this vomiting before this conversation or afterward?　It was between times.·

*Q.* He vomited very severely, didn't he?　*A.* He vomited once.

*Q.* Did he strain hard in vomiting?　*A.* No, sir.

*Q.* Did he complain of having swallowed a chew of tobacco?　*A.* He said he swallowed a chew of tobacco.

*Q.* Did he say that was the trouble with him?　*A.* No, sir; he said it was the lick that was the trouble.

*Q.* Who was present, now, when you had the talk with him?　*A.* The family.

*Q.* Was Marquis Young there?　*A.* No, sir; he called for him but I told him he was away and would be back in a few minutes.　He said it was too late for him.

*Mr. Silvers:* Now, Mrs. Keene, just turn to the jury here and tell the jury what he said to you as to what caused his death." (Objected to by defendant's counsel for the reasons heretofore stated.　Overruled by the court; to which ruling the defendant by his counsel then and there duly excepted at the time.) "*A.* He came home and said that Robert Johnson hit him and knocked him to the ground and then jumped on him and choked him and then bit him.

*Q.* Where did he say he bit him?　*A.* He said he bit him on that ear where the first lick was.

*Q.* When did he say he struck him first?　*A.* When he hadn't yet got steady on the ground—when he was getting off of his horse.

*Q.* Any other statements that he may have made about it you may state? *A.* He went on to talk to the family and told them that he was done for his day, that the lick had killed him."

On cross-examination, Mrs. Keene also testified:

"*Mr. Francisco:* *Q.* Was he conscious the next day? *A.* No, sir; he was not.

*Q.* Did he make any statement after the doctor come? *A.* No, sir. * * * He vomited as I told you in the afternoon yesterday, but he did not vomit hard. He just threw up. He threw up a piece of tobacco.

*Q.* Did he throw up a large chew of tobacco. *A.* It wasn't so very large. * * * The family was all there all together, and he spoke up so that all heard it— that the lick and the injuries had numbered his days.

*Q.* Did the doctor then know that he had received the lick? *A.* No, sir; the doctor hadn't got there then."

Miss Gertie Keene, the daughter of the deceased, who was not present either at the preliminary examination or at the inquest, testified:

"*Q.* Are you the daughter of Samuel Keene? *A.* Yes, sir.

*Q.* Do you recollect the circumstance of his coming home from Butler in March last, March 11? *A.* I recollect what he told me. * * *

*Q.* Did you hear any statements made by him? *A.* Yes, sir.

*Q.* Now, just tell the jury what he said on that occasion?

*Mr. Francisco:* We object to that because no foundation has been laid for such testimony. Overruled by the court; to which ruling the defendant, by his counsel, then and there duly excepted at the time. *A.* Why, he said that Robert Johnson hit him on the side ·

of the head and knocked him down before he had time to get his foot out of the stirrup and jumped on him and beat him and then bit him.

*Q.* Where did he say he had bit him? *A.* Right here on this side (designating).

*Q.* Did he state on which side of the head he hit him on? *A.* On the left side."

On cross-examination, the witness testified:

"*Q.* How long was it after he come home that he said that? *A.* I don't know just exactly how long it was; didn't have any timepiece, but it wasn't but a short time.

*Q.* Did he vomit any after he come home? *A.* He vomited once. * * *

*Q.* Did he complain of having swallowed a chew of tobacco? *A.* Yes, sir; he said that he did. * * *

*Q.* This was before the doctor came there? *A.* Yes, sir; and before he went to bed. He was laying on the bed while he was talking.

*Q.* Did he vomit any after that talk? *A.* He was talking and vomiting at the same time.

*Q.* Pretty sick? *A.* Yes, sir.

*Q.* Did he seem to be sick at the stomach? *A.* He complained of his stomach hurting him."

The names of neither of these witnesses was indorsed on the indictment. The foregoing is a comprehensive *resume* of the salient facts in evidence.

*Francisco Bros.* for appellant.

(1) Names of material witnesses must be indorsed on the back of the indictment. Revised Statutes, sec. 4097; *State v. Roy*, 83 Mo. 268. (2) If names of witnesses are not so indorsed on indictment, the presumption is indulged that they were not before the grand jury. *State v. Pagels*, 92 Mo. 300; *State v. O'Day*, 89 Mo. 559. (3) Before dying declarations are admitted

as evidence, it must appear to the satisfaction of the court that the declarant had abandoned all hope of living and under the impression of immediate dissolution; then should be restricted to the act of killing. *State v. Partlow*, 90 Mo. 608; *State v. Mathews*, 90 Mo. 571; *State v. Stephens*, 96 Mo. 637; *State v. Wensell*, 98 Mo. 137; *State v. Parks*, 96 Mo. 382; *State v. Elkins*, 101 Mo. 344. (4) Dying declarations of one unconscious are not admissible in evidence. 6 American and English Encyclopedia, p. 134; *Benfield v. State*, 15 Neb. 484; *Mitchell v. State*, 71 Ga. 128; *McHugh v. State*, 31 Ala. 317. (5) Each witness testifying must show, by his own evidence, that the declarant, at the time of making the declarations, was in a dying condition and fully conscious of that fact. *State v. Partlow*, 90 Mo. 609. (6) Defendant was surprised by the testimony of Mrs. Keene and Gertrude Keene as to the dying declarations of the deceased and had no reason to anticipate their testimony, because their names were not on the back of the indictment as the principal witnesses against him, nor did they appear at the preliminary examination or coroner's inquest in said cause, and because they had made statements to the contrary before the trial. *Fretwell v. Lafon*, 77 Mo. 27; *Peere v. Davis*, 29 Mo. 184; *Patrick v. Gas Light Co.*, 17 Mo. App. 462.

*R. F. Walker*, Attorney General, for the state.

(1) It was unnecessary that the names of Mrs. Keene and Gertrude Keene should have been indorsed upon the back of the indictment. The state is not restricted to the use or introduction of witnesses who testify before the grand jury, and whose names are indorsed on the back of the indictment. Revised Statutes, 1889, sec. 4077; *State v. Nugent*, 71 Mo. 244;

*State v. O'Day*, 89 Mo. 559; *State v. Phelps*, 91 Mo. 482. The objection is too late when made first in the motion for new trial, and should have been made, if at all, by motion to quash the indictment. *State v. Roy*, 83 Mo. 268; *State v. Griffin*, 87 Mo. 612. Certainly it cannot be contended that, because these witnesses were not used before the justice of the peace at the preliminary hearing, or before the grand jury at its investigation, the state is to be deprived of their testimony upon the trial. Such a contention seems absurd, more especially so when the record discloses no objection or exceptions at any stage of the trial until after verdict. This court has repeatedly held that a defendant will not be permitted to sit by and permit an error, if error it be, take chances upon the result of the trial, and, if convicted, then be heard for the first time to complain. *State v. Welsor*, 117 Mo. 570, and cases cited; *Childs v. State*, 10 Tex. App. 183; Hayne's New Trials, 79; *Braggs v. Moberly*, 17 Mo. App. 227. (2) The dying declarations were properly admitted. The testimony affirmatively shows, *first*, that deceased was conscious when he made them; *second*, that he had abandoned all hope of living, and was under the impression of immediate dissolution. *State v. Elkins*, 101 Mo. 350; *State v. Kilgore*, 70 Mo. 551; *State v. Chambers*, 87 Mo. 408; *State v. Draper*, 65 Mo. 335; *State v. Simon*, 50 Mo. 370; *State v. McCanon*, 51 Mo. 160.

SHERWOOD, J.—I. Complaint is made that the two witnesses, Mrs. Keene and her daughter, were allowed to testify, though their names were not indorsed on the indictment. But this objection was not opportunely taken and could not be raised for the first time in the motion for a new trial. *State v. Roy*, 83 Mo. 268; *State v. Griffin*, 87 Mo. 608.

II. A more serious objection to the testimony of these witnesses is in regard to the alleged dying declarations of deceased. Was their testimony, as delivered, competent to establish such declarations? One rule regarding such declarations, well established in this state and elsewhere, is that in order to make them admissible in evidence, there must not only be an actual nearness of death but an absolute conviction of it in the mind of the declarant. *Reg. v. Dalmas*, 1 Cox's Criminal Cases, 95.

It is not enough that the declarant should have thought that he should ultimately never recover; the declaration should be made under an impression of almost immediate dissolution. *Rex v. Van Butchell*, 3 Carrington and Payne, 629; *Reg. v. Forester*, 10 Cox's Criminal Law Cases, 368; 1 Greenleaf on Evidence [14 Ed.], sec. 158; Starkie on Evidence [10 Ed.] 38, and cases cited; *People v. Green*, 1 Parker's Criminal Reports, 11; *State v. Simon*, 50 Mo. 370; *State v. McCanon*, 51 Mo. 160; *State v. Partlow*, 90 Mo. 608; *Brown v. State*, 32 Miss. 433; *Starkey v. People*, 17 Ill. *loc. cit.* 21, and cases] cited; Wharton on Homicide, sec. 747.

It is this fact of nearness of death, combined with another fact, one equally as important, a profound and settled belief in such nearness of dissolution—that redeems such declarations from the domain of hearsay and dispenses with opportunity for cross-examination, one of the most indispensable tests and analyses afforded for sifting the statements of an ordinary witness. As this great safeguard of the truth of testimony cannot be thrown around such declarations, courts have been exceedingly careful that there should be a rigid adherence to the principles upon which, and the preservation of the constituent elements from which, they are formed. This view is aptly presented

by TURLEY, J.: "Testimony of this character is only admitted from necessity, and an abuse of it is guarded against by the law with most minute particularity. There is no one principle better established than that such declarations shall not be received, unless the proof clearly shows that the deceased was *in extremis* (perhaps the words *in articulo mortis* which are used by some of the authorities to express this condition, are more accurate), and that he. or she, at the time of making them, was fully conscious of that fact, not as a thing of surmise and conjecture or apprehension, but as a fixed and inevitable fact." *Smith v. State*, 9 Humph. 9.

The principle, as stated by Lord Chief Baron, EYRE, on which this species of evidence is admitted, is "that they are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood. is silenced, and the mind is induced by the most powerful considerations to speak the truth; a situation so solemn, and so awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice." *Woodcock's case*, 2 Leach, 563.

Touching the same subject, BYLES, J., said: "Dying declarations ought to be admitted with scrupulous, and, I had almost said, with superstitious, care. They have not necessarily the sanction of an oath; they are made in the absence of the prisoner; the person making them is not subject to cross-examination, and is in no peril. of prosecution for perjury. There is also great danger of omissions, and of unintentional misrepresentations, both by the declarant and the witness, as this case shows. In order to make a dying declaration admissible, there must be an expectation of impending and almost immediate death, from the causes then operating. The authorities show that there must be no

hope whatever." *Reg. v. Jenkins*, L. R., 1 C. C. R. 191.

The case at bar does not meet the requirements of the rule mentioned. Two men get down in the public road and engage in a fight; after scuffling awhile one falls, or is knocked, to the ground, the other one gets on top of him and the under one, on the representation . that he has swallowed a chew of tobacco, is allowed to get up. Getting on his feet, he walks a quarter of a mile, gets up behind his companion and rides home, and on the way there laughingly says he was not hurt. After he reaches home, however, he grows sick and vomits up the chew of tobacco, and then, while vomiting, tells his wife and daughter he is going to die, etc., etc. The nauseating effects of tobacco when swallowed need no comments; it is matter of common knowledge, and, therefore, of judicial notice. Besides, the witness, Mrs. Keene, was not allowed to tell her story in her own way; she was continually having leading suggestions and questions offered to her by the officiousness of the prosecuting officer. At the time deceased made these declarations he was without a physician; had no external indications of injury, and no one had apprised him that he was in danger. He may have been "*conscious*," and, though *conscious*, still may have been entirely without any absolute conviction and fixed belief of "almost ` immediate dissolution." As Judge WAGNER appropriately observes in *State v. Simon*, 50 Mo. *loc. cit.* 375: "Any person who has been accustomed to attend on those who are injured, or are very ill, knows how common it is for them to say that they will never recover, or that they will die, when there is no good or sufficient reason for the apprehension, and they are not conscious themselves that they are in any real danger. Such expressions are often the result of impatience, restlessness or great suffering. But, at the

same time, let the attending physician inform them that there is no hope and that they must die, and they will be perfectly startled."

III. There are other objections to the admission of the declarations. *First.* They are clearly fragmentary. Wharton's Criminal Evidence, sec. 299; Wharton on Homicide, sec. 770. *Second.* And though the substance of dying declarations are admissible, yet this is not so where such declarations are incomplete. Here the witnesses do not pretend to give either the words or the substance of what deceased said, or *all* that he said. *Third.* Nor does it appear that the declarant stated as part of his alleged dying declarations, *who* it was that struck him the blow and knocked him down. Mrs. Keene says he made such a statement when he first came into the house, but she does not state that this information was repeated when the alleged dying declarations came to be made.

IV. The propriety of the admission of dying declarations is a preliminary question for the determination of the court before they are allowed to go to the jury. Wharton on Criminal Evidence [9 Ed.], sec. 297; *State v. Simon, supra.* In the present case this course was not pursued, but the testimony was allowed to go directly to the jury without any preliminary determination by the court. But, even if the evidence to establish such declarations is admitted in the usual way, still, if improperly permitted to go to the jury, this is an error which can be corrected on appeal. *State v. Simon,* and Wharton on Criminal Evidence, *supra.*

V. As already seen, there was other evidence tending to establish defendant's guilt beside the eroneously admitted declarations; but it cannot be determined how much influence the latter had, either on the verdict or on the amount of the punishment assessed. *State v. McCanon, supra.*

For the errors aforesaid, the judgment should be reversed, and the cause remanded. BURGESS, J., concurs; GANTT, P. J., in a separate opinion as to paragraph 2.

SEPARATE OPINION.

GANTT, P. J.—I concur in reversing and remanding the cause and recognize the law as stated by my learned associate; but my concurrence in the reversal is based upon the fact that it does not sufficiently appear that the deceased had expressed his belief that he was bound to die, *before* he stated that defendant had inflicted the blow that caused his death. If the conversation with his family in regard to his consciousness of approaching death, *did in fact precede* the statement as to defendant striking and biting him, then I hold it was competent. I cannot bring myself to regard it as the statement of one merely suffering from nausea caused by swallowing tobacco. I do not think that many men would be moved to bid adieu to their loved ones forever, merely from having inadvertently swallowed tobacco juice.

That deceased's apprehensions that his death was imminent were well founded, appears from the fact, that in two hours he passed into a state of coma, from which he never fully emerged.

The evidence ought to be fairly obtained, but the fact that a dying declaration is made in response to questions does not render it inadmissible.

The objections to the leading character of the questions by the prosecuting attorney should be avoided as well as untimely interruptions, by defendant's counsel, on a retrial of the cause.