## DEAN *v.* STATE.

(In Banc. April 8, 1935.)

[160 So. 584. No. 31454.]

(In Banc.  May 27, 1935.)

[162 So. 155.  No. 31454.]

258

Gardner & Denman, of Greenwood, and **J. J. Breland,** of Sumner, for appellant.

**J. J. Breland,** of Sumner, for appellant.

A. F. Gardner, Sr., and Richard Denman, both of Green-wood, and J. J. Breland, of Sumner, for appellant.

Means Johnston and Fred M. Witty, both of Greenwood, and W. D. Conn, Jr., Assistant Attorney-General, for the state.

272

Gardner, Denman & Everett, of Greenwood, **J. J. Bre-land**, of Sumner, and **Maynard, FitzGerald & Venable**, of Clarksdale, for appellant, on suggestion of error.

Argued orally by **J. J. Breland, A. F. Gardner** and **Richard Denman**, for appellant, and by **Fred M. Witty, Means Johnston** and **W. D. Conn, Jr.**, for the state.

**Griffith, J.**, delivered the opinion of the court.

Appellant, the defendant, an unmarried woman, was indicted and convicted of murder by poisoning. The deceased was a surgeon and the defendant a specialist in pediatrics. The crime is charged to have been committed shortly after midnight on the morning of Friday, July 28, 1933, in the office of the deceased, the parties being there alone. The corpus delicti was established by a dying declaration made on the following Wednesday night, August 2d, the accusatory part of which was that "Dr. Dean gave me a drink of whisky with poison in it." Cf. Lipscomb v. State, 75 Miss. 559, 574, 23 So. 210, 230. The death occurred on Sunday morning August 6, 1933.

The trial occupied a period of several weeks, resulting in a record of eleven large volumes. There are many assignments of error, all of which have been elaborately and ably briefed. It would be impossible to discuss all these assignments in an opinion of reasonable length. We must, therefore, confine the discussion to the three more

important and serious of the assignments, adding only as to the others that they have been carefully examined and we find no error in them of sufficient gravity to require a reversal.

The ground for reversal to which the principal argument has been directed is that the verdict is against the great weight of the evidence. At the threshold of the inquiry on this assignment, we are met with the stubborn fact not only that there is sufficient evidence that the deceased died of mercurial poison, but that the evidence preponderates with great force in favor of that conclusion. There is a faint suggestion in the evidence that the deceased may have been a suicide, but this suggestion did not have a support in the case sufficient even to be argued in the elaborate opening briefs for the defendant. Beyond this, the record is absolutely silent upon any suggestion that the mercurial poison was given by any other than the defendant here. As already stated, the deceased in his dying declaration positively and directly charged her with the offense; there is no sort of substantial suggestion reasonable or otherwise in the entire record as to how or when or by whom he could otherwise have been given the fatal drug.

The chief basis for the contention by the defendant that the verdict is contrary to the weight of the evidence is found in the argument by her that the proof substantially fails to disclose a motive on her part to commit the cruel crime charged. The proof shows that about three years before the date of the commission of the alleged offense there had come into existence an intense infatuation between the parties, resulting in conduct which caused the separation of the deceased from his wife and ultimately in a divorce upon a suit therefor by the wife. There is evidence which, if fully believed by the jury, would show that this infatuation mutually continued, ardently and without abatement, until the very hour when it is charged that the poison was given. Upon

this state of case defendant earnestly submits that it is contrary to all reason that she should even be suspected of contriving or of desiring the death which is charged against her.

On the other hand, there is evidence sufficient if believed by the jury, and the jury did so believe as shown by their verdict, that the deceased soon after the divorce had, as often happens in such cases, entered upon a fundamental reconsideration of his real feelings, and of his conduct, and had determined to seek a reconciliation with his former wife, and to remarry her, if he could so persuade her. That his efforts in this determination had been successful, and the remarriage had been agreed upon to be consummated, according to existing plans, within a short time after the date when it is charged that the crime was committed. The theory of the state is that when the defendant definitely discovered this plan and the final determination of the deceased to persist in it, defendant poisoned the deceased rather than that he should return to his former wife.

According to the long course of observations drawn from general experience, there is no special difficulty in accepting a conclusion such as submitted by the state and as is last above stated. But if we recur to the contention urged by the defense and concede for the sake of illustration that the mutual affectionate attachment between the parties had continued unabated, and on the part of both of them, so that it would be hard to conceive that the defendant could have been willing to kill the object of her devotion, it would be even more difficult to conceive how it could be that the deceased, so ardently attached to the defendant, would, in his dying declaration and in his last deliberate statement on this earth, brand her as a murderess, and aver in this solemn statement of fact that she had brought about his death by giving him poison, if it were not in fact the truth. And in further connection with the argument made by the

defendant as to the ardently affectionate attachment then existing between the parties and which had so long existed, there is the fact of the most deadly significance, admitted by her, that although the deceased lingered between life and death for more than a week, she made not a single word of inquiry about his condition at any time, in any manner, of any person. If she did not well know the cause of his condition, how could she have remained thus silent?

The fact last mentioned was thoroughly developed and strongly pressed by the state upon the cross-examination of the defendant, and the only explanation offered by her was that she supposed that the deceased was merely on a spree, and for this reason she made no inquiry. This explanation did not explain; for the evidence strongly preponderates that the deceased was not a drinking man to any such extent as ever to go on sprees. The dying declaration, and the other evidence dealing with the circumstances of the crime, was to the effect that the defendant had several times called the deceased by telephone on that night, insisting that deceased meet her; that finally at midnight he shaved and dressed and went to her home, where she got in his car and went with him to his office; that she brought along with her a bottle containing whisky and that she and the deceased both took drinks therefrom in the office of deceased, and that finally the deceased suggested that it was late, that he was tired, and wished to go home, whereupon the defendant suggested that they take a farewell drink and requested the deceased to go into the hall and get some water; that the deceased went into the hall and upon his return the liquor was already poured; that the deceased upon taking this drink perceived that it had a strong metallic, astringent taste, and this was the drink which he declared in his dying declaration was poisoned. Subconsciously, therefore, the defendant in answering that she supposed that the deceased had gone on a spree, real-

ly answered that she was aware that he had taken one last drink from which he would never recover.

All such issues as those above stated are distinctly such as to be submitted to and settled by a jury of twelve men of "good intelligence, sound judgment and fair character" drawn from the body of the county. We know, of course, that juries sometimes make mistakes and sometimes deliver unjust verdicts; but we must largely depend upon them, for no better means for the ascertainment of truth upon controverted issues of fact in the general affairs of life have been found. And since this is generally true, how much more so must it be in a case such as this where there is involved, not the ordinary, tangible, and outward facts immediately perceptible to the physical senses, but those innermost problems of emotions and passions which must be reasoned out according to human experience and common observation of human conduct.

The various other issues of fact might be taken up in the order in which they have been presented, but the discussion of them would in every instance lead again, and inevitably, to the same conclusion as that above mentioned in reference to the issue of motive, to the conclusion that the several issues were for the jury, that there is sufficient in all the multitude of facts and circumstances to sustain the verdict, and that the verdict is not contrary to the great weight of the evidence. We, therefore, forego further discussion of that assignment and now proceed to a consideration of the competency and admissibility of the dying declaration.

Under the general rules governing the admissibility of a dying declaration, it is well settled that, ordinarily, the admissible portions of such a statement, other than that portion which would show that the declarant had abandoned all hope of recovery, must be confined to those particulars of fact as to the identity of the criminal agent, the facts of the delivery of the fatal wound, or the giv-

ing of the poison, and to such further statements as belong to the cause and circumstances of the act. 1 Wharton Criminal Ev. (10 Ed.), pp. 526, 527.

But when the defense contends, as here, that the declarant was not of rational mind and memory, a wider latitude is permitted so as to disclose from the other portions of the statement, if fairly necessary, whether the declarant was mentally qualified at the time, and it becomes a delicate duty on the part of the trial judge as to exactly how far contemporaneous statements not of the causes and circumstances of the crime are to be received for the purpose stated. For instance, there was admitted here, and correctly, that part of the dying declaration which referred to the insurance policies of the declarant, where they could be found, and where to find the combination to his safe. Also the statement about bills due, and those that he desired paid in particular and the reasons therefor. These all go to the mental competency of the declarant, put in issue by the defendant.

But there were some portions admitted which we think should have been excluded. The questions and answers to the declarant's mother as to whether he had been a brave and good son; and some others along that general line, which we will not crowd into this opinion, which would become of undue length if we should so undertake. But in view of the determined assault made by the defendant upon the mental capacity of the declarant at the time, we have concluded that the errors referred to are not of sufficient weight as to have had any perceptible bearing, harmful to appellant, upon the result of a trial running through the long course of five strenuous weeks, and we, therefore, hold that the stated errors, although technical errors, are not reversible errors.

The most serious question in the entire case and that which has given us the greatest concern is whether at the time of the making of the dying declaration the declarant was under the solemn sense that his death was

not only certain but was immediately impending. It is not enough that the declarant has surrendered all hope of recovery and believes that his death is certain from the present wound or injury. It is necessary in addition that he must, according to his settled and hopeless expectation, feel and believe that his death is then imminent or impending, that it will speedily come, or, as sometimes expressed, he must believe that the finger of death is upon him.

In this case the declarant gave directions to his brother that his insurance policies be looked after and that any premium about to become due on any of them be paid before his death. These policies were in his safe in a town some hundred miles away. He also requested that a minister be called to pray for him that he might live until his former wife and his child could arrive, who on that day were arranging, in response to cablegrams, to leave from a point in the Republic of Panama, and who by the most expeditious routes could not arrive except after three or four days' travel. The declarant was a physician and surgeon of admitted ability and of more than the ordinary experience and attainments in his profession. He knew what the evidence shows that the other physicians knew, namely, that the effects of the poison from which he was suffering were such in its then state of progress as not likely to cause immediate death, but was liable, immediately, and at any early hour thereafter, to put him into a state of unconsciousness or partially so, and to result in convulsions thereafter. In such a case we are content to say that it was not necessary that his expectation should then have been of immediate death, but it was sufficient, as was amply shown, that he entertained a settled and hopeless expectation of death, and that it was certain and impending and that it might come at once or in a very few days, during which intervening time he apprehended a state of total or partial unconsciousness. The testimony shows that he did suffer

that state after the next day from which he never emerged, dying finally on the fourth day.

It is not our purpose, in admitting the dying declaration in this case, to relax the rule so often heretofore. pronounced by this court that the declarant must have firmly believed that his death was impending, that his death would occur soon or speedily, that he was on the verge of death or at the point of death, that he was face to face with death, that the finger of death was upon him. But we would call attention to the fact that in a majority of the numerous cases on the subject heretofore in this court, no affirmative express proof was made either in the language of the declaration or otherwise that the declarant expected his death to follow at any particular short time, as, for instance, that night, that day, the following night or day, or any other particular future day or hour. The defendant argues that in those cases, since nothing was shown to the contrary, it would be inferred or presumed that the declarant expected death in a few hours or in a day or so at most. But if this strict issue of time be essential, as the defendant contends, then it must be affirmatively proved, and could no more be left to mere inference or presumption than could the issue that the declarant had abandoned all hope of recovery. Our cases, therefore, when the scores of them are considered as a body of the law on that subject do not support the strict contention made by the defendant.

The principle upon which the dying declaration is admitted, as a rule of necessity in homicide cases, is that it has been made after the declarant has become without any hope whatever of recovering from the wound or injury and when in his firm belief he has presently approached so near upon the verge of death that he can see as between himself and that inevitable event, soon to occur, no possible expectation, by anything he may do or say, of any personal benefit or advantage to himself in

any of the material affairs of the outside world; when
every motive to falsehood is silenced, and the mind is in-
duced by most powerful considerations to speak only the
substantial truth; when the attitude and expressions of
the declarant disclose that he is in accord with the sol-
emnity of the occasion; when the situation as to him and
his belief in respect to it is so solemn and impressive that
it may be trustworthily considered as creating an obliga-
tion equal to that which is imposed by a positive oath ad-
ministered in a court of justice.

We are of the opinion that, taking all the facts and cir-
cumstances so satisfactorily shown in proof upon this is-
sue in this case, the dying declaration here offered and
received meets every requirement of the rather strict test
above stated, and that to reject the declaration would be
to lay down a rule so narrow as in most cases to defeat
the object of the law in sanctioning the introduction of
that kind of evidence.

Finally, there is the serious complaint by the defendant
in respect to the conduct of the audience during the trial.
The affidavits offered by the defendant on the motion for
a new trial aver, to state the same briefly, that the court-
house was greatly crowded with spectators almost daily;
that an apparent majority of these spectators were ob-
viously biased in favor of the prosecution, and on several
occasions evidenced this opinion by applause when the
state had made a point, and by boos or hissing at things
done or said in behalf of the defendant. It is admitted
that on each of the stated occurrences the judge imme-
diately rapped for order and reprimanded the audience,
but took no other action more effectually to repress the
demonstrations, and gave no admonition to the jury.
No request was made by the defendant that the judge
do other than he did; no objection was entered of record,
no motion for a mistrial, and for the first time the point
was asserted by defendant on her motion for a new trial.

Every good citizen understands the requirement that

court sessions shall be conducted in good order, and the essential reasons for that requirement; every person of ordinary intelligence knows it. When demonstrations occur, such as here charged, disrespectful as they are to the personnel of the court and a contempt of its purposes and authority, it is the duty of the trial judge at the first outbreak thereof to immediately restore order, to admonish the audience of the gross impropriety, and to give distinct warning that a repetition will be punished; and, in addition, he should admonish the jury, speaking to them directly, but so as to be heard by the audience, that their duties are to decide only upon the law and the evidence, as the oath taken by them requires, and that demonstrations or like maneuvers by the audience, or parts thereof, are unlawful, and any attention paid to it by the jury would be, in view of their oaths, even worse. When the misconduct is repeated by the audience, or, as for that matter, by any person in it, the judge must take sterner methods. He should cause any and all persons so offending to be seized by the sheriff and brought to bar, there to be fined and committed until paid, or else fine suspended on condition that the offender absolutely absent himself from the courthouse or its environs during the remainder of the term; or upon such a repetition the judge may, and sometimes should, order the courthouse cleared of all except those who had no part whatever in the misconduct, and would not misbehave if allowed to remain, the privilege of any spectator to attend a public trial is conditioned strictly upon his proper conduct while there. And, in addition to the steps above outlined as to repeated disorder by the audience, the judge should again admonish the jury, addressing them directly, including an inquiry whether any juror will be in the slightest influenced by such repeated instances of misbehavior. When a trial judge does as he ought to do, and, as above indicated, fearlessly and without favor, and it becomes known thereby what he is certainly going to do, any

further disturbances will disappear. Smith v. State, 95 Miss. 786, 794, 49 So. 945, 27 L. R. A. (N. S.) 461, Ann. Cas. 1912A, 23.

All the aforementioned duties as to good order, and in respect thereof to see that the parties are furnished an impartial and uninfluenced trial, are upon the judge to be performed of his own motion. It is not the duty of any litigant to look after the keeping of order in court. Nevertheless, in nearly every jurisdiction throughout the country where the exact point has arisen it is held, and we concur, that, with the two possible exceptions hereafter to be stated, it is necessary, in order to avail of the misconduct of the audience for a new trial or a reversal, that the party object, and properly move the court at the time of the occurrences complained of, and before verdict. In the absence of objection or exception before verdict, the appellate court must consider that the misconduct was not nearly so serious or pronounced as it was afterwards asserted to be, and that the reprimands and rebukes of the judge addressed to it at the time were considered by the parties as a sufficient cure of the evil. Cf. Brush v. Laurendine, 168 Miss. 7, 150 So. 818.

The two suggested exceptions wherein it may be, but as to which we do not now decide, that a party will not be required to object or move before verdict are these: (1) Where there is an unfriendly demonstration so pronounced that the judge, if attentive, could not have failed to observe it, and he either does nothing whatever at any time about it, or else in such a feeble and complacent manner as to be the practical equivalent of having done nothing. In such a situation it might be held that the party is not required to take the risk that the judge upon the objection will still do nothing effective, and thereby make matters worse for the objector. (2) Where the attitude of the audience, or a sizable portion thereof, is so distinctly hostile and positively threatening as to make it dangerous for the party or his counsel to raise the ob-

jection. Neither of these possible exceptions is present in this case, and we are therefore not authorized to sustain the stated assignment.

Affirmed.

**Ethridge, J.,** delivered a dissenting opinion.

I am utterly unable to agree with the controlling opinion in the affirmance of this case. There were many errors committed in the trial, a number of which, in my opinion, should cause a reversal thereof. I am aware that in the trial of a case of this magnitude and duration in the court below there would, necessarily, be some errors of procedure.

The record consists of eleven large volumes, and the briefs by various counsel of several hundred pages. It would, therefore, be impossible to deal with all the matters complained of in detail.

In my opinion, the dying declaration was wholly inadmissible, and certain parts of it were so clearly inadmissible and so highly prejudicial in effect as to certainly cause a reversal of the cause.

In the first place, the declarant did not, so far as the proof shows, know that he was in the face or jaws of death at the time he made the alleged declaration, but, at most, he thought he would ultimately die. It may be conceded that he was of the opinion that he would not recover, but it is clear that he expected to live for a number of days, as his former wife was in the Canal Zone visiting friends, and the proof clearly shows that he expected or hoped to live until she could return therefrom to Jackson, Mississippi, which, ordinarily, required four or five days. She made the trip from the Canal Zone to Miami, Florida, in an airplane, and to Jackson, Mississippi, by railroad, and this consumed several days. It is clear, therefore, that the deceased expected to live until that time. The alleged dying declaration was made on

Wednesday night, and he lived until the following Sunday.

According to the proof, at the time of making the alleged dying declaration, he directed his brothers to secure his insurance policies in his safe in his office at Greenwood, Mississippi, and see whether or not they were approaching forfeiture for nonpayment, and to attend to paying the premiums. He then requested a Baptist minister to pray that he would live until his former wife and child reached his bedside.

To be competent, dying declarations must have been made (1) under the realization and solemn sense of impending death; (2) they must have been the utterances of a sane mind; (3) they must be restricted to the homicide and the circumstances immediately attending it and forming a part of the res gestæ; (4) a declaration is not admissible unless it would be competent and relevant if it were the testimony of a living witness; and (5) great caution should be observed in the admission of dying declarations and the rules which restrict their admission should be carefully guarded. Lipscomb v. State, 75 Miss. 559, 23 So. 210, 230.

In the case of Bell v. State, 72 Miss. 507, 17 So. 232, 233, the rule concerning dying declarations was discussed, and it was held that although the wife of the deceased testified that, when the deceased first met her, he said he knew he was about to die, since he said nothing more about it for several days and asked another to sell him goods on credit and risk his getting well to pay for them, his statement was inadmissible as a dying declaration. The wife there testified that she saw the deceased when they brought him home, and that he said, "I know I will die in a very few days, for I can't live this way. Ed Bell has killed me. I know it." The court there held that this statement did not conform to the rule of being in extremis, and that the expectation of life for a few days was

insufficient to supply the requirements of law for impending dissolution, or being in extremis.

In Brown v. State, 32 Miss. 433, 441, this court said that: "Declarations of this character are a species of hearsay evidence; and are admitted under an exception to the general rule which rejects all evidence of that nature. They are permitted, only, in cases of homicide; and from considerations of public necessity. The general principle, on which this species of evidence is received is, that they are declarations made when the party is at the point of death, having given up all hope of surviving. A sense of impending death is presumed to silence every motive to falsehood; and to induce the mind, by the most powerful considerations, to speak the truth. The obligation thus created is considered by the law as equal to that imposed by a positive oath in a court of justice. Rex v. Woodcock, 2 Leach, Cr. Cases, 567. That such declarations were made under a sense of impending death, is essential to their admissibility, and that they were so made is a preliminary fact to be proved by the party offering them."

In 30 C. J., page 251, section 493, it is said that: "In prosecutions for homicide, the declarations of deceased, voluntarily made, while in articulo mortis and under the solemn conviction of approaching dissolution, concerning the res gestæ of his destruction, where deceased would be a competent witness if living, are always admissible in evidence. . . ." Section 485, at page 253, holds that: "From the very necessity of the case, dying declarations are admissible to prove the fact of the killing, who was the murderer, and such other facts and circumstances as are immediately attendant on the homicide and form a part of the res gestæ. They may extend to the entire circumstances of the fatal occurrence, but should not include a narrative of matters not immediately connected with it." In note 11 to this text there are cited the following cases from Mississippi: Boyd v. State, 84 Miss.

414, 36 So. 525; Merrill v. State, 58 Miss. 65; Brown v. State, 32 Miss. 433; Lambeth v. State, 23 Miss. 322; Nelms v. State, 13 Smedes & M. (21 Miss.) 500, 53 Am. Dec. 94; McDaniel v. State, 8 Smedes & M. (16 Miss.) 401, 47 Am. Dec. 93. At page 255, section 498b, it is said that: "It is not enough that the statement be made when the declarant is in extremis, it is also essential that it be made when he has abandoned all hope of recovery from the injury inflicted by accused and is under the firm conviction that his death is inevitable and near at hand."

In McNeal v. State, 115 Miss. 678, 76 So. 625, 628, it is said that: "Before this declaration could have been admissible, it was incumbent on the state to have proven that at the time it was made the deceased must have believed in his immediate and impending dissolution." Citing Lambeth v. State, 23 Miss. 322, 354; Bell v. State, supra, and other cases upon this proposition.

The requirement of law, as stated in very many cases from this state, is that the declarant must have believed himself to be in the very face or jaws of death, and that his dissolution was near at hand, for his dying declaration to be admissible. Various expression have been used, but all indicate that there must have been a settled conviction in the mind of the declarant that he was about to die at once, or that he was so near death as that it was then present. In State v. Johnson, 118 Mo. 491, 24 S. W. 229, 231, 40 Am. St. Rep. 405, it was said that: "It is not enough that the declarant should have thought that he should ultimately never recover; the declaration should be made under an impression of almost immediate dissolution," citing various cases. "It is this fact of nearness of death, combined with another fact, one equally as important, a profound and settled belief in such nearness of dissolution, that redeems such declarations from the domain of hearsay, and dispenses with opportunity for cross-examination, one of the most indispensable tests and analyses afforded for sifting the state-

ments of an ordinary witness. As this great safeguard of the truth of testimony cannot be thrown around such declarations, courts have been exceedingly careful that there should be a rigid adherence to the principles upon which, and the preservation of the constituent elements from which, they are formed. This view is aptly presented by TURLEY, J.: 'Testimony of this character is only admitted from necessity, and an abuse of it is guarded against by the law with most minute particularity. There is no one principle better established than that such declarations shall not be received unless the proof clearly shows that the deceased was in extremis (perhaps the words ''in articulo mortis,'' which are used by some of the authorities to express this condition, are more accurate), and that he or she, at the time of making them, was fully conscious of that fact; not as a thing of surmise and conjecture or apprehension, but as a fixed and inevitable fact.' ''

In the old case of Reg. v. Osman, 15 Cox C. C. 1, is found this statement: ''If declarant thinks he will die tomorrow, it will not do.''

Also in 30 C. J. 504, is found this statement: ''And if they show that at the time of making the declaration declarant was under a sense of impending death, the declaration may be admissible in evidence, although declarant may not have said that he was without hope of recovery or was dying, or going to die.'' See, also, Ealy v. State, 128 Miss. 715, 91 So. 417; McDaniel v. State, 8 Smedes & M. (16 Miss.) 401, 47 Am. Dec. 93.

In 56 L. R. A., page 391, in a case note, it is said that: ''In considering the question whether dying declarations are admissible, the inquiry is, were such declarations uttered under the sense of impending dissolution,—under the solemnity of the conviction that death was near at hand, and there was no hope of the declarant's recovery? Whether he was fully conscious of the fact that he could not rally from the effects of his injury,—so that he en-

tertained no expectation of ultimate recovery. If this be true, then what he said under this conviction—this despair of recovery—touching the homicide and its attendant circumstances, which carried with it all the solemnity of a sworn declaration, is admissible, although in point of fact there was no rapid succession of death, and no apprehension of such event immediately following,'' citing Hussey v. State, 87 Ala. 121, 6 So. 420. ''But in Simons v. People, 150 Ill. 66, 36 N. E. 1019, it was said that dying declarations are such as are made relating to the facts of an injury of which the person making them afterwards dies, under the fixed belief and moral conviction that immediate death is inevitable. And in Walston v. Com., 16 B. Mon. 15, it was held that in the admission of dying declarations as evidence, it is considered that the constant expectation of immediate death will silence every motive to falsehood, remove every feeling of revenge, and the mind will be induced by the most powerful considerations to adhere strictly to the truth. And in People v. Robinson, 2 Parker, Cr. R. (N. Y.) 235, where statements of Lanigan, the deceased, were offered in evidence as his dying declarations, the trial judge said, 'I do not think the declarations would be admissible.' The man himself said he thought he should die; the physician did not apprise him that he was likely to die, but encouraged him to hope that he would recover. Now, Lanigan may have had the impression that he was going to die, but to constitute dying declarations, the person making them must be convinced that he is dying, must see death staring him in the face. Mr. Lanigan was not in this state for when he expressed the belief that he would not recover, his medical attendants encouraged him to believe and hope that he would. It would not be safe, under the circumstances, to admit the declarations.'' It is further said that ''a dying declaration is admitted in evidence because it is presumed that no person who is immediately going into the presence of his Maker will

do so with a lie on his lips." "Where statements are deficient in the most essential feature of dying declarations, namely, the fear of immediate death, they will be rejected; as also where the words used amount to nothing more than an expression that the party is in great danger and fears he must die, and where at no stage did the deceased have a settled, hopeless expectation of death," citing cases.

When we measure dying declarations under these statements, it is clear that the declarant in the case at bar did not think he was going to die immediately, or in a very short time. He certainly expected and hoped to live until his former wife and child could reach here from Panama in the Canal Zone, which required several days. It is also clear that he expected his brothers to go to Greenwood and procure his insurance policies and pay the premiums due thereon. It is also clear from the evidence that he requested the minister to pray that he would live until his former wife and child reached his bedside. In addition to this, he was given many blood transfusions with the hope of saving his life. The attending physicians had not given up hope of his recovery at the time the alleged dying declaration was made. The dying declaration testified to by Dr. Hand is that he told his brothers, "I have some things I want to talk to you about while I am conscious, and if there is anything you want to tell me or ask me, do it now." At that time his brothers started crying and the deceased said, "Boys, don't do that, you make it hard on all of us. We have always stood together, we are the three musketeers, it falls my lot to be the first to go, so boys brace up." He then turned to Henry and said, "I want you to still take care of Bessie Barry and Ann after I am gone just like you have always done. They are well provided for with insurance," and he mentioned the fact that he had two policies about to lapse and he wanted Henry and Barney to take care of them and see

that the insurance premiums were paid, telling them they were in his office safe in Greenwood. When asked about the combination, he said they would find it written down on a baby feeding chart in the dressing room adjoining his office. He then said, "I want you and Barney to have my equipment—you may not be able to use it, but I want you to have it along with other things, I want you to be sure that these good nurses are paid along with the other bills." About that time Dr. Barney said, "Preston, tell us how it happened," and Dr. Preston said, "Dr. Ruth Dean gave me a drink of whisky with poison in it. I think it was mercury." Dr. Barney was not satisfied and said, "Tell us how it happened," and he said, "She had been calling me up all hours of the night and Thursday night she called me several times . . . and I told her I was tired, the last time she insisted on his coming over and said she would not leave town until he did come over or did see her." He drove over there and she came out, got in the car, and they drove to his office. He said she had some liquor with her and they had several drinks and talked a while. He told her it was late and they had better go home. She insisted that he take a farewell drink and sent him into the hall to get some water, and when he got back with the water the drinks were poured already. As soon as he swallowed it, he knew something was wrong because it had a metallic taste and burned his mouth. He then took her home; drove down the first little street, stopped under a tree, and emptied his stomach, then drove to his office and took everything he knew to rid himself of the poison, and said he thought he had done that, and then stopped talking.

"Q. Did Barney or any one else ask him any further questions? A. Yes Barney asked him what he wanted him to do with this woman. Dr. Preston said, 'I know just how you feel about it, and I would feel the same

way you do. Do whatever is right, but don't do anything to keep we three from meeting in heaven.'

"Q. Was anything else said? A. Yes, Preston said he wanted to see the rest of the folks and other people were called in. Dr. Preston then said, 'Dr. Hand, you have been good to me and I want you to know I appreciate it. There is just one request I want to make of you, when the end comes, don't let me have convulsions. Give me big doses of morphine and atrophine.' . . . He said, 'We fought a mighty good fight, but it has been a losing fight.' ''

When his mother came into the room she asked Preston, "Are you about to leave us?" and he said, "Yes, have I been a good boy or a bad boy?" and she said, "You have been a good boy." This was objected to and the objection was overruled by the court. Then Preston said, "Have I been a brave boy or a coward?" and she said, "The bravest boy I ever saw." Then his mother asked him if there was anything he wanted her to tell Bessie Barry in case she did not get there, and he said, "Tell her I love her as I have always loved her and I know she loves me, there has never been any doubt as to our love for each other." This his mother said, "Son, do you think you are safe in the arms of Jesus?" Counsel objected and the court overruled the objection. Preston said, "Yes," and turned to Henry and said, "I want you to get Brother Allison to come pray that I may live until my wife and baby get here." Dr. Allison is superintendent of the hospital where the deceased was. It is estimated that about five or ten minutes elapsed before Dr. Allison arrived. Dr. Allison asked him how he felt, and deceased said, "I am a mighty sick man," and asked him to pray that he might live until his wife and baby arrived, and Dr. Allison prayed to that effect. It appears by this request that the decedent was not in immediate expectation of death, and did not think that death was upon him, but only thought that he would

ultimately die, and thought he would live until his former wife and child arrived.

It is difficult to see how this declaration could be admitted, and the declaration in the Bell Case, supra, excluded because the deceased there thought he could not live but a few days, and in the case at bar Dr. Preston Kennedy expected to live for, at least, a few days.

In the case of Hathorn v. State, 138 Miss. 11, 102 So. 771, 772, we held that to make a dying declaration admissible in evidence it must appear that the declarant was under a sense of impending death and had abandoned all hope of recovery. There the dying declaration sought to be admitted was testified to by the prosecuting attorney who said that the deceased sent for him and made this statement: ''I sent for you, you are attorney of this county, and I want to tell you before I die that this negro, Jim Hathorn, stabbed me for no cause in the world, and I don't feel like I will ever live—in fact, I know I will not live. I am bleeding inside now. If I die, I want you to know before I die the facts in this case, that you may know why it was done.'' The physician who attended him testified that the deceased made several statements with reference to his dying, and the morning he was sent to the hospital he said he would come back a dead negro. We said in that case: ''We do not think the dying declarations come up to the legal standard. We think the evidence does not show satisfactorily that the deceased thought his death was immediate or impending, or that he had abandoned all hope or considered his condition in extremis.'' This case was reversed.

Taking into consideration all the testimony in the case at bar with reference to the condition of Dr. Preston Kennedy at the time of the alleged declaration, we think it is very doubtful if he was sufficiently intelligent to know and appreciate the force and effect of his alleged statements. It is true that the statements, on their face,

appear to be intelligent and to have emanated from a sane mind, but it is undisputed that he had been, at that time, given large quantities of drugs that would tend to stupefy the mind to such an extent that he could not have been sufficiently rational to appreciate the force and effect of such statements, and to make it clear beyond a reasonable doubt that he was in such mental condition as to not fully understand the facts, or to make a correct statement in reference thereto. In this regard, the evidence shows that he had been under treatment for several days, without nourishment, which would tend to weaken his faculties, and that he had been given large doses of narcotics and other drugs which would naturally impair any normal mind.

But, whatever might be the conclusion which could be reached as to the clearness of his mind and the admissibility of the statement that Dr. Dean had given him a drink of whisky with poison in it, is clear that other parts of the alleged declaration were wholly inadmissible and were highly prejudicial. The conversation between the deceased and his mother had no remote relation to the res gestæ. Whether the deceased was religious, or as to his future state, likewise, had no kind of connection with the case. This conversation was wholly inadmissible, prejudicial, and clearly incompetent.

I will hereafter show that the statements alleged to have been made in that conversation were contradicted by numerous letters to Dr. Dean written by Dr. Preston Kennedy, some of them just prior to his illness. The majority of the court holds that these statements were incompetent, but the judges affirming the judgment hold that they were not prejudicial to the extent to call for a reversal of the case. It is difficult for me to see what possible collateral matter could be more prejudicial than statements of this kind. It was the enactment, in the courtroom, of a deathbed scene, well calculated to stir passions and emotions of the jury and the spectators,

and to create a violent antipathy and hostility toward the defendant. In addition thereto, one of the brothers of the deceased, when this point was reached in the course of his testimony, yielded to his emotions and wept. If there is anything conceivable that could create a more unfavorable impression against the defendant, we do not know it. The state attempts to bridge the chasm by creating the impression, without any proof thereof, that Dr. Preston had severed relations with Dr. Dean, and had informed her of his proposed intention to return to his former wife. This will be further considered.

I am of the opinion that it was clearly reversible error to admit the testimony as to the conversation between Dr. Preston Kennedy and his mother, and with others not connected with the alleged administering of poison. And I cannot consent to be silent with the announcement of law made by the affirming judges.

I think also that it was prejudicial error for which the cause should be reversed that the state was permitted to propound questions to physicians not embracing all the matters of fact embraced upon which a professional opinion was asked. They were permitted to testify as to symptoms observed while attending Dr. Preston Kennedy, and then to state that, from the facts they then learned, coupled solely with the fact that the state chemist found only a slight trace of mercury in parts of his organs, that his death was caused by mercurial poison. The amount of mercury found by the state chemist is so slight as to amount to practically no proof that Dr. Preston Kennedy's death was caused by such poison. The first effort of the state chemist to find this poison failed, and he made a second and the most severe test known to science, and found a very slight trace of mercury, such a small amount as one millionth of a gr. An analysis was made of the bowel passage and the kidney passage of the deceased while he was in the hospital by a most distinguished chemist, wholly disinterested, and he found

no traces whatever of poison. Taking the testimony of these disinterested experts, who did not know either of the parties, it would appear that there was insufficient evidence of mercurial poison to warrant the belief that he died from that cause. It was highly important to the interest of the appellant that all of the facts be embraced in the hypothetical questions propounded to the physicians who attended the deceased so that their professional opinions would not be from merely parts of the testimony. Yet the physicians who first attended Dr. Kennedy base their opinion on the fact that some trace of mercury was found.

In the recent case of Cates v. State, 157 So. 95, we laid down the rule as to hypothetical questions and this should be rigidly followed.

In considering this ground of error, we must keep in mind the facts that when the attending physicians were called to Dr. Preston Kennedy, he told them his condition was caused by his eating a "pig sandwich" and drinking whisky, and he insisted that it was not poison. The physicians treated him for the effects of what he stated he had eaten, and did not treat him for mercurial poison, and he was not treated for that until he reached the hospital in Jackson on Wednesday following the alleged taking of poison on Thursday night preceding. It is significant that the physicians who attended him did not testify as to what treatment he had given himself, he being a physician of skill and learning.

Finally, I think the judgment of conviction cannot be supported by the evidence in this case. Taking all the evidence and drawing from it just and reasonable conclusions, it is insufficient to convict, especially if it be segregated from the vast amount of incompetent evidence. Outside of the dying declaration, alleged to have been made, the evidence would be wholly insufficient, and I do not understand that there is any contention that the judgment could be upheld without the dying declaration.

Dying declarations are the weakest testimony known to the law, however much they may influence the popular mind.

The Supreme Court of Pennsylvania in a case many years ago, discussing dying declarations, said, in the case of Railing v. Com., 110 Pa. 100, 1 A. 314, 316: "The objections to the admission of such testimony [of dying declarations] are of the gravest character. It is hearsay, it is not under the sanction of an oath, and there is no opportunity for cross-examination. It is also subject to the special objection that it generally comes from persons in the last stages of physical exhaustion, with mental powers necessarily impaired to a greater or less extent, and, at the best, represents the declarant's perceptions, conclusions, inferences, and opinions, which may be, and often are, based upon imperfect and inadequate grounds. Nor is the reason ordinarily given for their admission at all satisfactory. It is that the declarant, in the immediate presence of death, is so conscious of the great responsibility awaiting him in the near future if he utters falsehood that he will, in all human probability, utter only the truth. The fallacy of this reasoning has been many times demonstrated. It leaves entirely out of account the influence of the passion of hatred and revenge, which almost all human beings naturally feel against their murderers, and it ignores the well-known fact that persons guilty of murder beyond all question very frequently deny their guilt up to the last moment upon the scaffold. But, in point of fact, the reason we are considering cannot be regarded as the real or the controlling reason for the rule, because, in terms, it would be just as applicable to declarations made by dying persons in regard to civil affairs, or to all minor criminal matters, as to the facts attending a homicide. In truth, there would be less temptation to falsifying in regard to such matters than in regard to acts of violence perpetrated upon the person of the declarant. Yet it is undisputed

that in all civil cases, and in all crimes other than homicide, such declarations are entirely incompetent. A far better reason in support of the rule, as it seems to us, is that dying declarations are admitted from the necessity of the case, and in order that murderers may not go unpunished. Such a reason only can justify their admission in cases involving the life of the accused. While ordinarily the precautions against illegitimate testimony increase with the danger menacing the accused, in this one exceptional case of homicide they are relaxed, and the rule which excludes mere declarations in all other cases is removed.''

Judge GRAY, in the case of People v. Kraft, 148 N. Y. 631, 43 N. E. 80, quoted in 41 American Law Review 668, said in part as follows: ''Dying declarations . . . are of the nature of hearsay, or secondhand evidence. . . . It never has been, and it is not to be, supposed that they have all the guaranties which surround evidence given under oath in a court of justice. . . . It is, of course, true that such declarations are considered to be equal to an oath taken in a court of justice; but that is because of the circumstances surrounding them when made. It is assumed that, being made in extremity, when the party is at the point of death, and believes that all hope in this world is gone, they have some guaranty for their truth, in view of the solemnity of the occasion, or as much as an oath in court would have. But it is clear that their value as evidence rests upon an assumption, and hence it is that, while the law recognizes the necessity of admitting such proof on a par with an oath in a court of justice, it does not and cannot regard it as of the same value and weight as the evidence of a witness given in a court of justice, under all the tests and safeguards which are there afforded for discovering the truth; . . . for there the accused has the opportunity of more fully investigating the truth of the evidence by the means of cross-examination, and the jury have the opportunity of

observing the demeanor of the person whose testimony is relied upon.''

Considering the rules, and recognizing the weakness of dying declarations as testimony, and viewing them in the light of all the facts in this case, they are utterly inadequate. To begin with, they are contradicted by the positive testimony of many witnesses, and they also contradicted a previous statement of Preston Kennedy himself to the physicians who first attended him, and are contradicted by numerous letters written by the deceased to the defendant in this case. They are also contradicted by the expert testimony of a number of physicians called as experts, and who had no personal relations with either the defendant or the deceased. The symptoms which are shown, without dispute, to have existed in the case of the deceased are not symptoms which would naturally have attended a case of mercurial poisoning. In 4th Enc. of Evidence, page 970, it is said that: ''The court will hear, and give weight to, evidence as to the character of the wound or injury which had been inflicted upon the declarant, as to his state of health, as respects whether he was sinking or not; as to whether or not he made manifestations of extreme suffering, and in short, as to whether or not the declarant had those symptoms which usually precede and accompany death.''

Under the state's theory, it was a necessary inference that the declarant on the alleged night that he took the poison had severed relations with the defendant, and informed her that there would be no future to their relations, and that he would remarry his former wife. The dying declaration omitted to state anything about what happened in the alleged last interview between the deceased and the defendant. It certainly seems that if that had been true, it would have been disclosed in the alleged dying declaration. The fact that the deceased was interrogated about what happened at that interview and did not state that anything of this kind had happened

is almost conclusive evidence that nothing of the kind did happen. The letters introduced show conclusively that it was not his purpose to sever their relations.

When he was first taken ill, his friend and confidant, Dr. Baskerville, attended him, and it is significant that the testimony does not show that this physician inquired as to what treatment Dr. Preston Kennedy had given himself prior to calling said physician, and it is significant that he told Dr. Baskerville that his illness was due to eating a "pig sandwich" and drinking whisky. It is not shown where he obtained these, nor does the dying declaration deny that the deceased had eaten this "pig sandwich," nor does the testimony show whether it may have caused ptomaine poison. He was treated for a number of days for ptomaine or alcoholic poison, and the symptoms of his illness were consistent with alcoholic or ptomaine poison, and were not the symptoms which, according to all the testimony, ought to attend a case of mercurial poison. For instance, the deceased, throughout his illness, had a high temperature, above normal, whereas the temperature, in a case of mercurial poisoning, always is subnormal. In other words, the symptoms which he did have were such as go with, or accompany, ptomaine or alcoholic poisoning, but not those which ordinarily accompany cases of mercurial poisoning. The fact that the deceased never communicated to these physicians who first attended him that he had taken mercurial poison is highly significant. The deceased was then in full possession of his faculties, in the hands of his friends, and had every opportunity and should have had every motive to disclose the truth, and the full truth, in reference to his illness. The fact that he was afterward given large quantities of narcotics that would naturally dull his mental faculties, coupled with the fact that his brothers were anxious to secure a dying declaration, and had an attorney in the city ready and willing, at all times to attend and witness a dying declaration,

but who was not present and was not called as a witness by the state, is highly significant.

The state introduced the former wife of the deceased and permitted her to testify as to a number of conversations between her and her former husband, and as to her suspicion that her husband was, on a number of occasions, called out of the city, giving reasons that he was attending patients at points where there were no telephones, and that she suspected that he was meeting the defendant, and testifying as to the inferences she drew from the facts of which the defendant had no knowledge and was not present, all of which was incompetent, other than the letters which she found in her husband's desk from the defendant. Certain statements made out of the presence of the defendant, as to the deceased's statements to his former wife, and as to their divorce, and as to promises and statements of her former husband as to his intention to remarry her, were so clearly incompetent that it is difficult to see how, even under the excitement of the trial, any one could say they were competent. It is manifest they had a powerful effect on the jury, especially when coupled with the deathbed scene heretofore referred to, and the alleged dying declaration. The purpose of introducing the former wife of the deceased was to play upon the prejudice, passion, and sympathy of the jury, but if her evidence is considered in connection with the letters introduced from the deceased to the defendant, it is shown that the deceased was insincere and deceptive. If we were trying the defendant for social error or moral imprudence, it would be a different matter from what it is when we are trying her for the highest crime known to the law. The law does not expect human perfection, nor does it expect that human beings will always walk with circumspection along the straight and narrow way that leads to paradise, but it recognizes that the majority of these walk in the broad ways of error

and at times yield to the temptations of the world, the flesh, and the devil.

In order to determine whether the deceased's attitude was one of desiring to sever the relations existing between him and the defendant, it will be in order to read what he wrote her just a few days prior to his death, and other letters prior thereto, which show, if the deceased had any sincerity at all, an intense love for the defendant. On June 26, prior to his taking the alleged poison, he wrote her as follows:

"Dear, you so thoroughly misconstrued the meaning of what I said. You think of one reason only when truly there are many. You must believe me when I say this because it is positively true. I love you so much that I would give up everything in the world for you. What more can I say? What can I do to make you believe me and love me as I want you to? Won't you give me an opportunity to see you? You have all my love and I am yours if you want me."

On July 20, 1933, just one week prior to his taking the alleged poison, the deceased wrote the defendant as follows:

"Darling, What you said to me this P. M. is driving me almost crazy. You cannot mean what you said. You must believe me and reconsider."

Surely these letters do not speak of a purpose or desire to abandon the defendant and remarry his former wife. It is impossible to set out excerpts from all the letters written during the period in which the divorce between the deceased and his former wife took place, at which time the defendant was in Lewes, Delaware, and during this period the deceased had every opportunity to reconcile himself with his wife as she seemed to be perfectly willing to do, provided he would agree to live truly in the matrimonial relations.

These letters reflect on the part of Dr. Preston Kennedy an earnest desire to marry the defendant. They speak

the language of unrequited love, and there are about one hundred fifty of them all speaking tenderly of love, and express no desire to become reconciled to his former wife, or to abandon the defendant. In one letter he writes:

"My darling. Your last three letters have been so sweet and the last one was so dear and contains so much I just cannot destroy it. What you said in this letter just means everything to me and I shall keep it and read it when I'm lonesome and blue and that pretty often. I did something to-day I don't believe I've ever done before—come to my room at 2 P. M., undressed and went to bed. There's really nothing doing in the way of business and these 'damned' gossiping women's tongues are loose at both ends. They even say I went to see you recently instead of going to a surgical association. This came to me through Dr. George (Baskerville) who gives it the lie and says we (he and I) were together all the time. Really, he does not even suspect that we saw each other. This talk will stop, I'm sure in a week or so. I have come to the conclusion that I will live my life in the way which will give me the most pleasure and not in the way the public thinks I should live it."

In another letter he writes as follows: "I am doing nothing but being lonesome for you and loving you. You are the dearest and most precious person to me in the world, and I love you more than I know how to tell you. A note from you would be so much appreciated and will reach me at the office. Please don't be unhappy, darling."

In another letter he writes to the defendant as follows: "After reading your letter to-day several times and while thinking of you, I fell asleep and waked up crying. I must tell you about the dream, it was so realistic—You and Francis Kennedy were dressed up and looked like a million dollars, and just ready to go to a party, you got into a new car, started it and in some way lost control of it and it turned completely over, throwing you out, I rushed to you and you were completely 'knocked out.'

To me you appeared to have a fractured base. I took you up in my arms and in a few minutes you revived, but I could not stop crying. Francis' attitude over my very intense concern over your welfare, I remember, was so noticeable I could not easily forget it. She could not seem to understand why I should be so personally interested. You 'cleared up' pretty soon and asked me if I could not run by to see you for a little while the next night. You can imagine what the answer was. The moral in this dream is, I think, don't drive into any ditches,'' etc.

In another letter written by Dr. Preston Kennedy while he was in Chicago to the defendant he said, among other things, as follows: ''For many months each day I have looked forward with so much anxiety and pleasure to this occasion, and when you positively said no last night it almost killed me. I had not slept any up until two-thirty A. M. and certainly none after talking to you. What on earth is the trouble darling? Is it that there is some one else in Greenwood? You know you have never given me a reason why you would not, and have always said you probably would, what am I to think?'' etc.

In practically all the letters introduced, the deceased assures the defendant that he loved her more than any other person, and he used various terms of endearment in these letters. The identity of the deceased's writing was never questioned even by his brothers.

Dr. Dean was to be married to a Captain Maull on August 8th, just a few days after Dr. Kennedy's death. The letter of June 20, 1933, from Dr. Kennedy to Dr. Dean was written right after Dr. Kennedy learned of this. The record shows letters from Captain Maull to Dr. Dean showing this proposed marriage, and it is established, without dispute, and completely refutes the state's theory of a motive, on the part of Dr. Dean, to kill Dr. Kennedy.

It is clear that the state's theory as to what happened

on the night of the last interview is false. There can be no reasonable doubt that this theory is utterly without support from the evidence in the record.

There are many circumstances that tend to lead to the conclusion that Dr. Preston Kennedy may have taken poison himself with the idea of ending his life. He was greatly despondent for several days, as shown by his letters. It is also shown that he expressed to a friend the fact that he was in desperate financial circumstances, and did not see how he could make it, and he was very blue. It is also shown by the evidence that he was carrying large life insurance policies, many of which provided for double indemnity in case of accidental death. The theory of suicide is supported with as many facts as the theory that Dr. Dean killed deceased. Where there are two reasonable theories arising out of the evidence, that which supports innocence must be accepted, even though the theory supporting the guilt may be more probable. See Hogan v. State, 127 Miss. 407, 90 So. 99; Algheri v. State, 25 Miss. 584, 1 Morris State Cases, 658.

It is no pleasure to chronicle these things. I would much prefer, in all cases, to have the good that men do live after them, and the evil to be buried with their bones. But, where the life of another is involved, we are not permitted to indulge in this view. The testimony in this case, without dispute, reflects that the deceased, his former wife, his physician and friend, and others utterly failed to set forth what was said when he was at the office and drank the alleged poison. Can we approve a conviction on such evidence? I cannot. I have no knowledge, whatever, of the deceased or the defendant, other than is disclosed from the argument, record, and briefs in this case. I know none of the parties personally, and only write because I believe that a great wrong, in a legal sense, has been done the appellant.

McGowen, J., concurs in the conclusions reached herein.

**Cook, J.,** delivered a dissenting opinion.

I concur in the views of the judges affirming the judgment in this case that at the time the deceased made the alleged dying declaration he was of rational mind and memory, and was under a proper realization and sense of impending death. Consequently, I am of the opinion that so much of the declaration as was connected with the homicide and the circumstances immediately attending it, and formed a part of the res gestæ, was properly admitted in evidence. I also concur in the view that the verdict is not against the great weight of the evidence, and that, in view of the fact that the appellant made no objection whatever to the alleged misconduct of the audience at the time it occurred, she cannot now avail thereof.

I agree, however, with all that Judge ETHRIDGE has said in his dissenting opinion as to the prejudicial effect of that part of the dying declaration which depicted the pathetic deathbed scene, wherein the past and present character, and future state and condition of the deceased, and other matters were discussed with members of the family, and a message from the declarant to his former wife was delivered to his mother, which in effect tended to contradict the basis of appellant's defense. This part of the declaration was not remotely connected with the homicide or the circumstances immediately attending it, constituted no part of the res gestæ, and was therefore clearly inadmissible. The only purpose that this incompetent testimony could have served was to arouse the sympathy and play upon the passion and prejudice of the jury.

I also concur in the view that a great part of the lengthy testimony of the deceased's divorced wife, which is referred to and fully discussed in the dissenting opinion of Judge ETHRIDGE, was incompetent, and highly prejudicial.

For the errors indicated above, I am of the opinion that the judgment of the court below should be reversed and the cause remanded for a new trial.

**Smith, C. J.**, delivered the opinion of the court on suggestion of error.

The judgment herein was affirmed by an equally divided court. We have carefully re-examined the assignments of error in the light of the appellant's suggestion of error on the merits—a document replete with apt references to "the law and the prophets" and perfect in legal and literary style—and adhere to the views expressed by us in our former opinions. Consequently, Judges GRIFFITH, ANDERSON, and SMITH are of the opinion that the suggestion of error should be overruled, and Judges MCGOWEN, COOK, and ETHRIDGE are of the opinion that it should be sustained and the judgment reversed.

Counsel for the appellant, in another suggestion of error, say that where the judges of this court are equally divided on the question of error vel non in the rulings of the trial court, the judgment of that court should be reversed; but all of us agree that this can only be done with the concurrence of a majority of the judges.

That an equal division of the judges of an appellate court on the question of the reversal vel non of the judgment of a trial court results in the affirmance of the judgment has been many times decided by this court, beginning with Brewer v. Crum, 111 Miss. 871, 72 So. 700.

When this court is sitting in banc, there must be at least four of its judges present; and no action can be taken by it unless a majority of the judges present concur therein. When a cause is brought to the court on appeal, the judgment of the trial court is presumed to be correct and must remain in effect unless and until the court enters an order on its minutes reversing or setting it aside. This can be done only when a majority of the judges participating

in the decision concur therein. When the court is equally divided on the question of affirmance or reversal, it cannot, of course, reverse the judgment. What then should it do? There are two possible ways of solving this difficulty. One is to dismiss the appeal on the ground that the court is unable to decide the case. This is the course pursued by a few American courts. The other is to affirm the judgment. This is the course pursued by other American courts, including the Supreme Court of the United States, and by the English courts, 4 C. J. 1121, including the House of Lords, Reg. v. Millis, 10 Cl. & Finn., at p. 907; 8 Eng. Reprint at p. 982; 17 Eng. Rul. Case at p. 160. While the effect of both methods of disposing of a case is practically the same, the latter is the more logical.

When a cause is carried to an appellate court, what the appellant does is to request or move the court to reverse or set aside the judgment rendered by the trial court. Under the general parliamentary law governing deliberative assemblies, a motion is lost unless a majority of the members of the assembly present vote in favor of it. Courts are governed by the same rules. Consequently, if an appellant's request or motion for the reversal of the judgment against him fails to receive the vote of a majority of the judges, it is lost; the judgment remains in effect without error being declared therein, and the logical thing for the court to do is to so say by entering an order affirming it. In concurring therein, the judges who think there is error in the record do not surrender their views, but simply act upon a long and well-established rule of procedure governing the situation confronting them. If they should contumaciously disregard this rule of procedure and decline to concur either in dismissing the appeal or in affirming the judgment, the record would remain forever in the appellate court, and the judgment although in effect could not be enforced. This is clearly stated in State v. McClung, 47 Fla. 224,

37 So. 51, 52, followed in Randall v. L'Engle, 52 So. 594, 46 So. 2.

A judgment rendered pursuant to this procedure disposes of a case as effectually as does one wherein all the judges are of the opinion that the record is free from error, and that no injustice is thereby inflicted on an appellant is illustrated by the case at bar. Here seven judges have considered the appellant's case, one below and six here. Four, a majority of them, one below, and three here have said that there is no reversible error in the record. To reverse the judgment under such circumstances would, or should, shock the legal and judicial conscience, to say nothing of the disregard thereby of a long-settled judicial practice. The appellant's judgment was affirmed for the same reason that every other unsuccessful appellant's judgment is affirmed; i. e., she has failed to convince a majority of the court that there is error in the proceeding in which her judgment of conviction was rendered.

But it is said by the appellant's counsel that under two amendments to the Constitution of the state, sections 286 and 287 thereof, the court is without power to affirm a judgment when its judges are equally divided on the question of error vel non in the record. These sections are as follows:

"Section 286. The Supreme Court shall consist of six judges, that is to say, of three judges in addition to the three provided for by section 145 of this Constitution, any four of whom when convened shall form a quorum. The additional judges herein provided for shall be selected one for and from each of the Supreme Court districts in the manner provided by section 145 of this Constitution, or any amendment thereto. Their term of office shall be as provided by section 149 of this Constitution, or any amendment thereto.

"Section 287. The Supreme Court shall have power, under such rules and regulations as it may adopt, to sit

in two divisions of three judges each, any two of whom when convened shall form a quorum; each division shall have full power to hear and adjudge all causes that may be assigned to it by the court. In event the judges composing any division shall differ as to the judgment to be rendered in any cause, or in event any judge of either division, within a time and in a manner to be fixed by the rules to be adopted by the court, shall certify that in his opinion any decision of any division of the court is in conflict with any prior decision of the court or of any division thereof, the cause shall then be considered and adjudged by the full court or a quorum thereof.''

This case was submitted first to a division of the court, which then directed its submission to the court in banc. The argument is that the court can adjudge a cause only with the concurrence of a majority of its judges; consequently, an equal division thereof adjudges nothing. The words, ''the cause shall then be considered and adjudged by the full court or a quorum thereof,'' as used in the Constitution, have no bearing on the procedure by which the court functions, except to permit the court to act when some of the judges are absent, provided a quorum (i. e., a majority) thereof are present. The word ''adjudge'' means simply to decide or determine judicially. The ultimate question which an appellate court must determine in a case brought to it on appeal is the character of the judgment to be rendered by it. This it does after all the judges participating in the decision have expressed their views thereon. If a majority are then of the opinion that there is reversible error in the record of the proceeding in which the judgment under review was rendered, the court so adjudges and enters a judgment of reversal. But, if only a minority of the judges are of the opinion that there is error in the record, the court then adjudges, as hereinbefore set forth, that the judgment be affirmed. In both instances the court acts judicially and adjudges the cause. This was the con-

clusion arrived at by the Supreme Court of Florida in State v. McClung, supra, under a Constitution providing that the ''concurrence of a majority of the members of the court, sitting in any cause wherein the court shall sit as one body, shall be necessary to a decision.''

But the appellant's counsel further say that this rule of procedure ''has no application to a criminal case wherein the presumption of fact of innocence as a defense attends dehors the facts. The Robertson Case (Robertson v. Mississippi Valley Co.), 120 Miss. 159, 81 So. 799, heretofore referred to is the law of the case and a precedent to be followed, although Judge STEVENS vigorously dissents. In this case, the judges were equally divided upon the affirmance or reversal—error or no error, guilt or innocence—and thereupon adjudged the accused guilty by affirming the judgment. When the court divided, guilty or not guilty, there was present, but not considered, this presumption of fact that the accused was presumed to be innocent until guilt was proven beyond a reasonable doubt. The opinion or finding of three of the judges that accused was not guilty and that the judgment should be reversed was per se reasonable doubt of guilt, and all of the judges were bound to give effect to the presumption of fact of innocence dehors the record. And if effect is to be given to this fact of innocence, the necessary and logical result should be that the judgment should be reversed. No effect, it seems, was given to this presumption of fact of innocence. If given effect as a controlling factor, in view of the equally divided court, the court should have reversed the judgment, and it was error not to do so. The failure to give effect to this presumption of fact of innocence denied accused due process and equal protection under the Federal Constitution. This presumption is one of fact and attends the accused through the whole trial. It is a fact in this case and cannot be disregarded.''

This contention is based on two misconceptions: (1)

That a majority of this court have found that the accused was not guilty; and (2) of the scope and effect of the presumption of innocence. The guilt or innocence of an accused is always a question for the decision of the jury, unless the court can affirmatively say that under no view of the evidence could the jury rightly find that the accused is guilty. Four of us said that the evidence was sufficient to support a verdict of guilty; two that it was not.

On the trial below, the appellant was presumed to be innocent until the jury said by its verdict that she was not. The presumption of innocence then disappeared and was superseded by the presumption that "the verdict of the jury is right and the defendant is guilty." 16 C. J. 536; section 3403, Code 1930; Spivey v. State, 58 Miss. 743; Fleming v. State, 60 Miss. 434. Omnia præsumuntur rite et solemniter esse acta.

Finally, the appellant's counsel say, in effect, that the equal division of the judges here demonstrates that there is grave doubt as to the correctness of the judgment of her conviction—leaves that fact uncertain; and, therefore, those of us who are of the opinion that there is no error in the record should surrender our views and vote to reverse the judgment. This is but a specific instance of a very old complaint that the judges of a court are sometimes unable to agree on the law governing a case under consideration by them, i. e., the uncertainty of the law. This complaint is but an incident to the also very old "quest for certainty" and is not peculiar to the law but appears in every department of life, and can never end. The law is not an exact science, and the idea that it "is, or can be made, unwavering, fixed, and settled" is a legal myth. Frank's Law and the Modern Mind, p. 20. This results from defects inherent in human nature. That the judges of courts sometimes differ as to the law furnishes no more ground for destructive criticism of the law or the courts than does the fact that ministers of the Gospel

differ in their interpretation of the Bible justify destructive criticism of the church or of the Bible and its authority.

But we have not differed on all the questions of law presented by this record. All of us agree on the rules governing the admission and exclusion of most of the evidence here under consideration. Our differences, in the main, are only as to whether the facts bring the evidence within or without those rules. In other words, our differences, in the main, or not legal but factual. It can be safely said that an examination of the reports of the decisions of this court will disclose that in most of the cases decided by it, its judges agreed on both the law and the facts; and, further, most of the differences of opinion among the judges, when such have occurred, have not been on the law, but on the facts. Differences in the factual field are not peculiar to judges, but appear in every department of life.

Should the affirming judges surrender their views and concur in a reversal of this judgment? The answer to this question depends upon "the nature of the judicial process." A judge when deciding a judicial question must do three things: (a) Find the facts; (b) find the governing law; and (c) apply that law to the facts. When the court is composed of more than one judge, each of them must do these three things, and then vote for such judgment as his legal and judicial conscience approves, in the words of his oath of office, "according to the best of my (his) ability and understanding." If after full and free consultation with his associates, a judge is unable to agree with them, he should adhere to his views. For him to do otherwise would "turn judgment to wormwood and leave off righteousness." Of course, if he has a doubt as to the correctness of his views and his associates are sure of theirs, a judge may conscientiously surrender his views and vote with his associates. But

the affirming judges here, while according due deference to their associates, are not faced with such a doubt.
The suggestion of error is overruled.